In re Charles L. MELENYZER, Debtor.

Bankruptcy No. 5–85–00338–C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Aug. 12, 1992.

Lawrence A. Beck, Beck & Beck, P.C., San Antonio, Tex., for George A. Benz.

James S. Wilkins, San Antonio, Tex., for trustee Martin W. Seidler.

Bill Frazell, San Antonio, Tex., Asst. U.S. Trustee.

## OPINION AND ORDER ON BENZ' OBJECTION TO TRUSTEE'S SUPPLEMENT TO TRUSTEE'S FINAL REPORT AND ACCOUNT

LEIF M. CLARK, Bankruptcy Judge.

CAME ON, for hearing and further consideration, the objection of George Benz to the Trustee's Supplement to the Trustee's Final Report and Account filed pursuant to this court's previous directive. At issue is the construction of the phrase "interest at the legal rate" used in 11 U.S.C. § 726(a)(5). Upon consideration of the arguments of counsel and the relevant case law, the court concludes that "interest at the legal rate" means the federal judgment rate, determined as of the date the bankruptcy petition was filed, for the reasons set forth herein.

## BACKGROUND FACTS

Although the facts of this case are quite complicated,[1] the relevant facts of the specific issue at hand are quite simple. The Trustee's Supplement proposes to pay the unsecured creditors interest, *pro rata,* from the approximately $12,000 in cash remaining in the estate. Under the Trustee's proposal, however, some property would be returned to the debtor. Accordingly, the court has requested that the Trustee liquidate further assets, so as to pay—if possible—the unsecured creditors the full amount of interest due on their claims from the date of filing, until the date the claims are paid. Creditor Benz has argued that the term "interest at the legal rate" means that he is entitled to the contract rate of interest (18%). This court, in dicta in *In re Laymon,* however, has construed the phrase to mean the federal judgment rate. *See In re Laymon,* 117 B.R. 856 (Bankr. W.D.Tex.1990), *rev'd on other grounds,* 958 F.2d 72 (5th Cir.1992). Regardless of which rate applies, more assets have to be liquidated to pay the interest claims, but the interest rate used will dictate the extent to which further liquidation must proceed.

## ANALYSIS

Case law construing "interest at the legal rate,"[2] as that term is used in 11

---

1. The facts of this case have already been extensively discussed in a prior decision. *See In re Melenyzer,* 140 B.R. 143 (Bankr.W.D.Tex.1992).

2. At the outset, we note that the precise statutory language is "interest at *the* legal rate." Use of the definite article "the," rather than an indefinite article "a" or "an," suggests that Congress intended that a single rate of interest be used, as opposed to the multiple rates of interest which would necessarily result if state law or contract rates were applied.

U.S.C. § 726(a)(5), is rather sparse and essentially is divided into two basic categories: (1) those courts which have held that state law defines the phrase, and (2) those which have held that the phrase means the federal judgment rate.

## The State Law Approach

The first category includes those courts which have held that state law defines "interest at the legal rate." *See, e.g., In re Adcom, Inc.*, 89 B.R. 2, 2 (D.Mass.1988) (citing *In re Shaffer Furniture Co.*, 68 B.R. 827 (Bankr.E.D.Pa.1987) for the proposition that "interest at the legal rate" refers to the interest rate set by state law); *In re Anderson*, 28 B.R. 628, 631–32 (S.D.Ohio 1982) (citing *In re Marx*, 11 B.R. 819 (Bankr.S.D.Ohio 1981) for the same proposition, although *Marx* rejected the contract rate as an option (11 B.R. at 820)); *In re Rivera*, 116 B.R. 17, 18–19 (Bankr. D.P.R.1990) (claimants of solvent Chapter 7 estate would be entitled to interest from the date of filing at the Puerto Rico legal rate); *In re Boyer*, 90 B.R. 200 (Bankr. D.S.C.1988) ("legal rate" should be determined in accordance with South Carolina statutory law). Although this first category represents the majority approach, few of the cases explain why state law should define "interest at the legal rate." To the extent that any rationale is offered at all, the courts have focused upon the purpose of Section 726(a)(5) in providing for postpetition interest, i.e. "to prevent debtors from abusing the bankruptcy process by using it to delay payments and avoid interest obligations when at the time of filing the petition the debtor was actually solvent." *In re Kentucky Lumber Co.*, 860 F.2d 674, 676 (6th Cir.1988). Viewed in this light, Section 726(a)(5) appears to require a balancing of the equities between the creditor and the debtor (as opposed to among the creditors) because the next distribution, after Section 726(a)(5), goes to the debtor. *See In re Continental Airlines Corp.*, 110 B.R. 276, 280 (Bankr.S.D.Tex.1989).

In *In re Beck*, for example, the court found that the "scale balancing the equities … overwhelmingly tilted toward restoring the creditor to as near a position as the creditor would have occupied absent bankruptcy before benefitting the [debtor] with surplus funds." *In re Beck*, 128 B.R. 571, 573 (Bankr.E.D.Okla.1991). As a result, the *Beck* court held that "interest at the legal rate" means "that rate of interest to which creditors would have been entitled through any appropriate legal proceeding had the bankruptcy petition never been filed." *In re Beck*, 128 B.R. at 573. Thus, if a contract between the parties establishes the rate of interest on any unpaid but payable amount, the rate established in the contract would control. *Id.* On the other hand, if a specialized rate of interest for a particular creditor is established by a specific statute, that rate would likewise be applied on any claim for post-petition interest. *Id.* Finally, any general unsecured claims without the benefit of a specified rate of interest—either by contract or by specific statute—would be paid pursuant to the federal judgment rate established by 28 U.S.C. § 1961. *Id.* The *Beck* court went on to point out that a debtor already "receive[s]" the ultimate benefit of a discharge through bankruptcy and should not be permitted to overextend the 'fresh start' concept to unrecognizable bounds." *Id.*

Similarly, the *Continental Airlines* court found that the "debtor should not be entitled to any surplus of property of the estate until all the creditors allowed claims, including interest, are paid in full." *In re Continental Airlines*, 110 B.R. at 280. And the court cited by Creditor Benz in the case at bar held that "where a debtor has contracted for a rate of interest, and has sufficient funds to pay the bargained-for amount, the creditor is entitled to the agreed-upon rate." *See In re A & L Properties*, 96 B.R. 287, 289–90 (Bankr.C.D.Cal. 1988). Otherwise, " 'the debtor would be permitted to retain value directly at the expense of the creditor.' " *Id.* (quoting Fortgang & King, *The 1978 Bankruptcy Code: Some Wrong Policy Decisions*, 56 N.Y.U.L.Rev. 1148, 1152 (1982)). Continuing to quote from the Fortgang & King article, the *A & L Properties* court went on to say that

[o]rdinarily, bankruptcy laws and rules affect the rights of creditors in favor of or at the expense of other creditors by changing the rules that would prevail outside a bankruptcy court in order to more equitably allocate the values of the debtor [among] the creditors. The alteration of a valid, binding, and legal contractual obligation, so that the debtor retains nonexempt property prior to the payment of its valid debts, is a legally startling and somewhat appalling result. Under this "legal rate" theory, the Bankruptcy Code effectively states that the statutory rate of interest is preferred to the rate of interest to which the parties have themselves agreed and that the difference should be retained by the debtor. There does not appear to be any substantial policy consideration that would sanction this result.

*Id.* In the absence of any authority to the contrary, the court found the reasoning of Fortgang & King compelling and held that "where the debtor's estate proves solvent, a contract creditor is entitled to post-petition interest at the rate set forth in the contract." *Id.* In the alternative, the court held that "where a claim in bankruptcy is based upon a contract which provides for a rate of interest, and where the bankrupt estate is solvent, the 'legal rate' under Section 726(a)(5) is the applicable prejudgment rate for breach of contract actions under state law." *Id.* (citing *In re Boyer,* 90 B.R. 200, 201 (Bankr.D.S.C.1988) and *In re Shaffer Furniture Co.,* 68 B.R. 827 (Bankr.E.D.Pa.1987)).

The problem with the state law approach is that different creditors will have different rates of interest, depending upon their contracts or the applicable statutory rate. One contract might provide for interest at 18%, another at 9%. One state statute might set the rate at 10%, another applicable statute a rate of 6%. So long as there are enough remaining assets to pay all these varying interest claims, the intention of *Beck* and *A & L Properties* is easily vindicated—the debtor is not permitted to

retain assets while creditors still have entitlements outstanding. Quite often, though, there are only enough assets to pay *some* interest to creditors, *not* enough to pay *all* creditors *all* the interest they claim at their contract or statutory rates. Using those rate, some creditors would receive a disproportionately large percentage of the remaining assets compared to their underlying unsecured claims, to the prejudice not of the debtor, but of other, otherwise equally situated, unsecured creditors. The rationale of *Beck* and *A & L Properties* will not support such disproportionate treatment as among similarly situated creditors.[3]

### The Federal Judgment Rate Approach

■ These pitfalls of the state law approach and other problems as well are avoided by the second category of cases, wherein the courts have held that "interest at the legal rate" means the federal judgment rate, a position which this court adopted in *In re Laymon,* 117 B.R. 856 (Bankr.W.D.Tex.1990). Although *Laymon* involved the appropriate rate of interest payable to an oversecured creditor under 11 U.S.C. § 506(b), the court explored the meaning of "interest at the legal rate" in 11 U.S.C. § 726(a)(5) because both Code sections are exceptions to the general rule that post-petition interest is not payable. *Id.* at 859–60; *see also* 11 U.S.C. § 502(b)(2). Initially, we pointed out that the award of post-petition interest is a matter within the discretion of the federal court and arises under federal law. *Id.* at 860; *see also In re Investment Bankers, Inc.,* 135 B.R. 659, 665 (Bankr.D.Colo.1991). Next, we identified three principles which should guide a court in deciding whether to award post-petition interest:

(1) The justification for interest, if it is to be paid at all, is in compensation for the detention of money occasioned by the bankruptcy case itself, a detention visited equally on *all* creditors of the bankruptcy estate by a process operating un-

---

**3.** Recall that *Beck* and *A & L Properties* focus on the competing entitlements of the debtor and the unsecured creditors *as a group*—not on the

*competing* entitlements of unsecured creditors *within* the group.

der the exclusive auspices of the federal judicial system, and a detention not directly related to the prepetition agreements the debtor struck with its creditors. The obligation is the bankruptcy estate's, not the debtor's. *Id.*

(2) If there is a surplus, creditors should be compensated for the delay occasioned by bankruptcy before any balance is returned to the debtor. *Id.* at 861.

(3) Postpetition interest awards should be consistent with the principle of equitable, ratable distribution of the estate assets to estate creditors. *Id.*

Applying these principles to the *Laymon* facts, this court concluded, *inter alia*, that (1) the term "interest at the legal rate" in 11 U.S.C. § 726(a)(5) is not the contract rate because that "would fly in the face of equitable distribution of assets" and is "expressly *excluded* from allowance by Section 502(b)(2)"; (2) the term "interest at the legal rate" does not refer to state law because federal law controls the payment of postpetition interest; and (3) the federal judgment rate is the appropriate rate of interest for both Section 726(a)(5) and Section 506(b). *Id.* at 861–63. Although the Fifth Circuit reversed the district court's affirmance of *Laymon*, the Circuit court only addressed the 11 U.S.C. § 506(b) rate of interest, not this court's dicta on the Section 726(a)(5) "legal rate." *See In re Laymon*, 958 F.2d 72 (5th Cir.1992). Consequently, the Section 726(a)(5) analysis is still available for deciding the matter at bar, notwithstanding the Fifth Circuit's decision.

■ The instant case now affords us another opportunity to consider the meaning of "interest at the legal rate," and once again we conclude that the appropriate rate of interest payable to unsecured creditors pursuant to 11 U.S.C. § 726(a)(5) is the federal judgment rate. As we pointed out in *Laymon*, use of the federal judgment rate not only assures a ratable distribution, but it also meets the requirement that federal law decide a federal issue. *In re Laymon*, 117 B.R. at 862. Using the federal

judgment rate, moreover, affords all affected parties a predictable, easily ascertainable, nationally uniform rate and best comports with the analytical posture of claims *vis-a-vis* the federal bankruptcy. *Id.* Upon bankruptcy, absent a timely objection, all claims against the estate are "deemed allowed" as of the filing. 11 U.S.C. § 502(a). From and after the petition date, then, creditors hold the equivalent of a federal judgment against estate assets, enforceable only in federal court.[4] *Id.* (citing 28 U.S.C. § 1334(a) (original and exclusive jurisdiction over bankruptcy), § 1334(d) (exclusive jurisdiction over property of the estate); 28 U.S.C. § 157(b)(2)(B) (claims adjudication a core proceeding); 11 U.S.C. § 524(a) (discharge bars further assertion of prepetition claims against the debtor); 11 U.S.C. § 362(a) (automatic stay of acts to collect claims against property of the estate); 11 U.S.C. § 726 (distribution of assets in satisfaction of claims); 11 U.S.C. § 1141 (confirmed plan binds all holders of claims against the debtor)).

■ This latter fact leads us to conclude that, for purposes of 11 U.S.C. § 726(a)(5), the federal judgment rate selected should be that in effect as of the date of filing, as opposed to the date of distribution. Use of this rate is further supported by the fact that the time value of money being compensated by 11 U.S.C. § 726(a)(5)—for the delay imposed by the bankruptcy process—is the time value effective as of the petition date, not as of the date of distribution. Bankruptcy gives all creditors what amounts to a judgment against the debtor as of the filing date. 11 U.S.C. § 502(a). In all other judgment situations, the interest rate is calculated as of the date of judgment—i.e., the date when the obligation was created—not the date upon which the judgment is paid. Setting the legal rate of interest as of the date of distribution thus makes little sense.

At least one court has followed *Laymon*, though for slightly different reasons, concluding that "interest at the legal rate" means the federal judgment rate. *See In*

---

**4.** This fact is founded upon the legal fiction that, but for the bankruptcy, creditors could

have pursued their remedies against the debtor and had their money on the date of the filing.

re *Godsey,* 134 B.R. 865, 867 (Bankr. M.D.Tenn.1991). In *Godsey,* Chief Judge Paine found—as did the Fifth Circuit in *Laymon*—that 11 U.S.C. § 506(b) requires the court to look to the contract for the applicable rate of interest for oversecured creditors. He noted, however, that Section 726(a)(5), unlike Section 506(b), makes no express reference to any agreement between the parties. From this, he concluded that 11 U.S.C. § 726(a)(5) directs courts to look elsewhere for the appropriate interest rate. Ultimately, he settled on the federal judgment rate as the logical analog to what state courts do outside of bankruptcy, i.e. apply the applicable judgment rate. *Id.*

## *"Second Cut" Rejected*

■ Judge Paine, like this court, was unconvinced by the authority supporting the use of the contract rate of interest. *Id.* at 867–68. However, he rejected that portion of *Laymon* which provides for an equitable "second cut," at the contract rate or under state law, in those cases where the estate has assets in excess of what is needed to pay all unsecured creditors interest fully at the federal judgment rate. He found such a "second cut" to be unsupported by statute, as well as potentially complicated and confusing. *Id.* at 868.

In light of Judge Paine's criticisms and because the *Melenyzer* estate, now before the court, potentially has more assets than are needed to pay interest to all unsecured creditors fully at the federal judgment rate, but not enough to pay all creditors at their contract or state statutory rates, we have reevaluated our "second cut" proposal. Clearly, there remains a certain equitable appeal to offering unsecured creditors a "second cut" of interest, paid *pro rata* under state law or according to the creditors' respective contract rates, after insuring that each unsecured creditor has received a minimum interest payment at the federal judgment rate. In fact, this approach would work in cases where the estate is sufficiently solvent to pay every unsecured creditor the full amount of inter-

est due under state law or according to the terms of their prepetition contracts.[5] However, the inadequacies of the "second cut" approach become readily apparent in a case such as the one at bar, where the assets exceed those needed to pay all unsecured creditors interest at the federal judgment rate, but fall short of what is needed to pay them all under state law or at their contract rates. In such a case, establishing a consistent, predictable, statutorily appropriate formula for *pro rata* distribution for the "second cut" becomes a formidable task indeed. More significantly, a "second cut" exposes the federal judgment rate approach to the very same liabilities which militate against the use of the state law approach in the first place. How, for instance, does one make a *pro rata* allocation when each creditor's amount is set by a different percentage? How does one even figure what the *pro rata* percentage is? The "second cut" undercuts *pro rata* distribution among unsecured creditors and so must be rejected, even though, as a result, some assets might be returned to the debtor. Notwithstanding the policy argument articulated in *A & L Properties,* it is nearly impossible to devise a readily usable formula which will both achieve *pro rata* distribution *and* assure that no assets go back to the debtor until all creditors are paid everything they claim to be owed under their prepetition agreements. Put to such a choice, courts should revert to the statute itself for guidance—and the statute here specifies interest at *the* legal rate, implying one rate rather than the multiple rates suggested by *Beck* and *A & L Properties. See* 11 U.S.C. § 726(a)(5).

## CONCLUSION

In light of the foregoing, we now find that "interest at the legal rate," referenced in 11 U.S.C. § 726(a)(5), means the federal judgment rate, determined as of the petition date, as opposed to the date upon which the claim is paid (because the filing of a bankruptcy petition is essentially the equivalent of creditors getting a judgment

---

**5.** Of course, in such situations, there would be no need to offer creditors two "cuts" because interest could be paid fully at the contract rate or under state law on the first "cut."

against the debtor). In the instant case, the federal judgment rate in effect upon April 24, 1985, the petition date, was 9.15%.[6] Therefore, the Trustee is directed to liquidate sufficient assets to pay all unsecured creditors interest at 9.15%, from the date of filing until the date their claims are/were paid in full. Should any assets remain in the estate after that distribution in made, they will presumably be returned to the debtor, pursuant to 11 U.S.C. § 726(a)(6).

As a final note, we find that Judge Paine's criticisms of the "second cut" approach are well taken and that, for those and other reasons, the "second cut" approach should not be adopted.

SO ORDERED.

6. Memorandum from the Administrative Office of the United States Courts to All Clerks of

Court of June 29, 1992, at 2.