**In re Rosario CHIAPETTA d/b/a Euro Design Kitchen & Bath, Debtor.**

**Bankruptcy No. 91–16268S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 1, 1993.

Mary Jeffery, Philadelphia, PA, for debtor.

Christine C. Shubert, Tabernacle, NJ, trustee.

Deborah R. Gross, Philadelphia, PA, Sp. Counsel, for trustee.

Frederic Baker, Philadelphia, PA, Asst. U.S. trustee.

## *OPINION*

DAVID A. SCHOLL, Bankruptcy Judge.

### A. *INTRODUCTION*

ROSARIO CHIAPETTA ("the Debtor"), whose individual voluntary Chapter 7 bankruptcy yielded a solvent estate as the result of receipt of proceeds of a settlement of certain litigation, has filed certain Objections to the proposed Distribution of his

estate's assets submitted by CHRISTINE C. SHUBERT, ESQUIRE ("the Trustee"). We conclude that, except for certain unitemized requests for reimbursement of costs, his challenge to the Application for compensation filed by his counsel in the litigation, BERNARD M. GROSS, P.C. ("Gross"), for its one-third contingent fee is not well-taken, because, even when making disallowances for services performed by Gross pre-petition and post-petition prior to Gross' Application for appointment as the Trustee's special counsel to conduct the litigation, the contingent fee sought is reasonable. However, we sustain the Debtor's objections to the addition of interest at six (6%) percent, to the administrative claims of the Trustee and Gross from the date of their respective appointments. Rather, we conclude that neither the Trustee nor Gross are entitled to any interest because their claims did not arise until our instant awards were entered. We also hold that interest to the Debtor's unsecured creditors must be calculated at the federal judgment rate at the time of the filing of the case, as established in 28 U.S.C. § 1961, which was 5.42 percent, rather than at Pennsylvania judgment rate of six (6%) percent.

## B. FACTUAL AND PROCEDURAL HISTORY

The underlying voluntary Chapter 7 bankruptcy was filed by the Debtor on November 25, 1991. The Trustee was appointed as interim trustee on December 5, 1991. The Schedules initially filed by the Debtor do not reflect any claims of the Debtor arising from the Debtor's suit against Alno Kitchen Cabinets, Inc. and Bert Stolp ("the Defendants"), then pending in the local federal district court ("the Alno Suit"). In that Suit, in which Gross was his counsel, the Debtor sought to recover substantial damages for the Defendants' alleged breach of a contract to provide the Debtor with exclusive rights to market their product locally.

The Trustee filed a no-asset report in this case immediately after the Meeting of Creditors on January 3, 1992. It is unclear when the Trustee learned of the existence of the Alno Suit. We note that, on March 16, 1992, the Debtor amended his Schedules to list the Alno Suit as an asset for the first time, valuing it at $600 and claiming it as exempt. We also note that, on May 10, 1992, the Trustee filed a Praecipe seeking to change this case to an asset case. However, a non-descript docket entry of the Praecipe resulted in this court's approving the no-asset report and discharging the Debtor and the Trustee on July 23, 1992. The case was closed on July 27, 1992.

On August 24, 1992, the Trustee filed a Motion to Reopen the case to administer the asset reflected by the Alno Suit. This Motion was granted on September 24, 1992. On September 25, 1992, the Trustee filed an Application to employ Gross as her special counsel to handle the Alno Suit on a "contingent fee basis," the precise terms of which were not disclosed. On October 1, 1992, upon Certification of No Objection after notice to, inter alia, the Debtor, we entered an Order approving the employment of Gross, to which we added the following annotation:

> However, compensation shall be allowed only upon the filing and court approval of Fee Applications prepared in conformity with [Local Bankruptcy Rule ("L.B.R.")] 2002.2. The contingency arrangement may be subject to court review and adjustment. See In re Crouse Group, Inc., 75 B.R. 560 (Bankr.E.D.Pa. 1987) [(holding that this court should review the services performed before allowing compensation on a contingent-fee basis)].

A status hearing on this case was conducted on January 19, 1993. Upon the Trustee's advice that settlement of the Alno Suit was imminent, we entered an Order of January 20, 1993, which provided, inter alia, that March 1, 1993, was the bar date for filing "all claims, including the filing of any Fee Applications except the Trustee's professionals, which shall be filed on or before April 30, 1993." The Trustee was also directed to "file all papers, including any remaining Fee Applications, necessary to conduct a Final Audit hearing on or

before April 30, 1993." A Final Audit hearing was tentatively scheduled on August 10, 1993.

On January 26, 1993, Gross filed a motion seeking court approval of a proposed settlement of the Alno Suit for the sum of $50,000. The Debtor objected and vigorously contested this motion on the ground that the proposed settlement was inadequate. A hearing on this motion was ultimately conducted on March 30, 1993. Thereafter, we granted this motion and approved the settlement. That decision was not appealed.

On April 19, 1993, prior to the bar date established in our January 20, 1993, Order, the Trustee filed her Final Audit Report ("the Audit") with the office of the United States Trustee ("the UST"), as required by that office. We note that, since the UST desires sixty (60) days to review Audits prior to filing, they are not docketed with the clerk of this court at that time, but only after they are reviewed and approved by the UST. The Audit package included fee applications of the Trustee and Gross and a Proposed Order of Distribution ("the Distribution Order"). The Distribution Order stated, in relevant part, as follows:

| Party Entitled to Distribution | Claim Amount | Expenses | Interest | Total to be Paid |
|---|---|---|---|---|
| Court Costs | $ | $ 39.00 | $ 4.00 | $ 43.00 |
| The Trustee | 1,364.26 | 74.54 | 150.99 | 1,589.79 |
| Gross | 16,666.67 | 2,174.89 | 942.10 | 19,783.66 |
| Getano Vetri & Catherine Vetri | 9,227.82 | | 922.80 | 10,150.62 |
| Consuelo Prior | 6,700.00 | | 670.00 | 7,370.00 |
| Surplus to Debtor | | | | 11,397.93 |
| TOTAL | | | | $50,335.00 |

The Audit was reviewed by the UST and approved by that office, and then filed with this court and recorded on our docket for the first time on June 24, 1993. Since the Audit was submitted earlier than anticipated per our January 20, 1993, Order, the Final Audit Hearing was promptly noticed and moved up to July 27, 1993.

The Debtor, by his counsel, appeared and vigorously objected to the Distribution Order. The Trustee, the Debtor's counsel, the UST, and the court engaged in a lively discussion of relevant issues regarding computation of interest in asset cases involving solvent debtors. Testimony was received from Deborah R. Gross Kurtz, Esquire ("Deborah"), who had done most of the work in the case, in support of Gross' contested Application for fees and costs.

Deborah testified that she had been retained by the Debtor to represent him in the Alno Suit in early 1991. She stated that she began legal work on the Suit in April, 1991, and filed a Complaint on August 6, 1991, in the local federal district court. Gross' Fee Application recited that, from April, 1991, through March 30, 1993, the value of its services, if computed on a lodestar basis, would amount to $32,256.25, and its costs of $2,174.89 were itemized as follows:

| CATEGORY | AMOUNT |
|---|---|
| Telephone/Telecopier | $ 44.71 |
| Photocopying | 781.71 |
| Postage | 33.10 |
| Filing Fees | 120.00 |
| Deposition Transcripts | 1,195.37 |
| TOTAL | $2,174.89 |

Gross recited, in its Fee Application, that it would accept the amount allegedly set forth in its retainer with the Debtor, thirty-three and one-third (33⅓%) percent of the $50,000 recovery, or $16,666.67, plus costs.

Deborah testified at the hearing that she was not advised and was totally unaware that the Debtor had filed this or any bankruptcy case until the defense brought up the issue at a deposition of the Debtor on April 15, 1992. Once advised of the bankruptcy, Deborah testified that she contacted Shubert, and the Alno Suit was stayed by the district court. *But see Maritime Electric Co. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3rd Cir.1992) (only actions brought *against* a debtor are stayed by a bankruptcy filing). In support of the hourly rate requested, Deborah testified that, in complex matters such as the Alno Suit, her hourly rate is $225. She also noted that, in her contract with the Debtor, the contingent fee provided for was in fact forty (40%) percent of any recovery, but that she had erroneously advised the Trustee and hence was resigned to receive one-third (33⅓%) of the recovery, plus her costs, as her fee.

In light of the importance of the issues to administration of solvent debtors' estates, the interested parties were accorded until August 23, 1993, and August 30, 1993, respectively, to file opening and reply "statements of authority and/or calculations regarding the appropriate compensation due" and "the interest due to the creditors and administrative claimants" in this case.

On August 23, 1993, the Debtor filed a Brief, and the Trustee and UST submitted letters addressing these issues. The Trustee also submitted a letter-reply on August 25, 1993. No other submissions were received.

The Debtor objected to Gross' entire application because it was allegedly not filed by the April 30, 1993, bar date and because Gross had allegedly breached its duty to the Debtor by seeking to disclose privileged information at the Audit hearing. In the alternative, the Debtor claimed that Gross' fees and costs should be reduced to $2,700 because the Fee Application failed to adequately disclose the services and costs; Gross had attained unimpressive results; and Deborah's services were entitled to be compensated at a rate of no more than $100/hour. The Debtor also argued that Gross and the Trustee were not entitled to any awards of interest because they were responsible for delays in the case and their applications did not represent "claims" entitled to receive interest under 11 U.S.C. § 726(a)(5).

The Trustee stated that she had calculated interest on her fees (and those of Gross) at six (6%) percent, from the time of their respective appointments through the first week in August, 1993. Similarly, the interest for unsecured creditors was calculated at six (6%) percent from the date of the filing of the case. The Trustee did concede that she erred in calculating the creditors' interest to their disadvantage.

The UST, in its letter-submission, noted that this court, in *In re Shaffer Furniture Co.,* 68 B.R. 827, 831 (Bankr.E.D.Pa.1987), had established that the appropriate rate of interest to be paid to creditors of solvent estates, under 11 U.S.C. § 726(a)(5), was six (6%) percent per annum. However, he also argued, with respect to the claims of Gross and the Trustee, that interest should accrue only from the date that their claims were approved by the court.

In her letter/reply of August 25, 1993, the Trustee contended, in response to the Debtor's arguments, that Gross had no interest adverse to the Debtor, the services rendered were excellent, and the requests for compensation and reimbursement of expenses were reasonable. The Trustee also noted that she had accelerated rather than delayed administration of the case. As to her interest calculations, the Trustee stated that this court had awarded her interest at six (6%) percent from the date of her appointment in another case involving a solvent debtor, and she therefore assumed that this method of computation was correct.

## C. DISCUSSION

### 1. GROSS IS ENTITLED TO MOST OF THE FEES AND COSTS WHICH IT REQUESTS.

■ Initially, we address and reject the Debtor's contention that Gross is not entitled to an award for fees because she failed to file the request for same with the clerk of this court by April 30, 1993, the bar date established by this court in its January 20, 1993, Order. As noted at page 155 *supra*, the Audit and its enclosures, including Fee Applications, must initially be filed with the UST. In such matters, the UST is acting as the agent for the court, and we therefore hold that filings of Fee Applications with that office within the applicable bar date must be deemed timely filings. Consequently, Gross' Fee Application cannot be denied as tardily filed.

■ We agree with the Trustee that Gross disclosed no privileged information and breached no duty to the Debtor in defending its compensation from his attacks. We also agree that the services performed and the results achieved were respectable. Finally, there is no evidence that Deborah's claimed hourly rate is excessive.

The issues which the Debtor overlooks in her attack of the amount of compensation sought by Gross is that Gross was appointed by this court, in its Order of October 1, 1992, to receive compensation on a contingent-fee basis. In fact, the title of the Application and the Order of October 1, 1992, expressly note that Gross' employment is "on a contingency fee basis."

■ It is true that the contingency-fee rate is not recited in the Application or the Order, as it probably should have been. However, normally, this court, in setting a contingency-fee rate, would respect the terms of a reasonable pre-petition contingency-fee agreement. In this case, Deborah testified without rebuttal that the terms of Gross' pre-petition contingency-fee contract with the Debtor contemplated a forty (40%) percent contingency fee. Only a one-third (33⅓%) contingency-fee rate was, however, sought in Gross' fee application. We find no evidence that this contingency-fee rate was unreasonable, given the speculative nature of the Debtor's cause of action.

It is also true that our Order appointing Gross required Gross to file a Fee Application pursuant to L.B.R. 2002.2, *i.e.*, carefully providing a description of, and the date and time of, each service performed, as would be required for the normal lodestar analysis. The *Crouse Group* Order, in which we made the same request of special counsel, is also incorporated in our Order.

■ As we explained in *Crouse Group*, this requirement is imposed merely to permit this court to determine what services were performed as one element in determining the appropriate allowable fee. 75 B.R. at 560. Another important element is, of course, the figure set forth in the contingency-fee agreement, to which deference will be accorded as long as it is not out of line.

■ Our practice in entering Orders like that in this case and in *Crouse Group* serves several purposes. First, it eliminates the court's inability to alter a contingency-fee agreement proven to be unconscionable without having to establish that the contingency-fee rate was initially "improvidently granted." *See* 11 U.S.C. § 328(a); *In re Reimers*, 972 F.2d 1127, 1128–29 (9th Cir.1992); *In re CS Associates*, C.A. No. 93–2085, 1993 WL 315656 (E.D.Pa. August 18, 1993);[1] *In re Benassi*, 72 B.R. 44, 48–49 (D.Minn.1987); and *In re*

---

1. In *CS Associates,* this court neglected to add the reference to L.B.R. 2002.2 and *Crouse Group* which appears in the October 1, 1992, Order, to an order appointing special counsel. Counsel's lodestar time records revealed services valued at less than $50,000. Believing our omission of the references to L.B.R. 2002.2 and *Crouse Group* from our appointment Order to have been improvident, we reduced a requested one-third (33⅓%) contingency rate award of $250,-000 to $150,000. The district court reversed our Order and awarded special counsel the entire $250,000. We do not believe that this unconscionable result would have transpired had we entered an Order appointing special counsel in *CS Associates* which included references to L.B.R. 2002.2 and *Crouse Group,* as we did in the instant case.

*Confections by Sandra, Inc.*, 83 B.R. 729, 731–33 (9th Cir. BAP 1987). We believe that such an Order gives us the full right and duty to determine whether the contingency fee award is unconscionable. Second, it puts the professional appointed on notice of the necessity to keep and retain time records and to be subject to this court's potential adjustment of the contractual contingent-fee rate in making its award.

■ However, in the instant factual setting, we find that Gross' contingent-fee rate award is not unconscionable. As Gross' Fee Application establishes, a lodestar for the entire period of service would have resulted in an award of almost double the contingent-fee award sought. Even if we deducted from Gross' award all prepetition services and all time for the period between April 15, 1992, and September 25, 1992, after Gross found out about the bankruptcy case but neglected to file a fee application, we note that Deborah alone documented about 85 hours of services. At a rate of even $200/hour, a fee of $16,-666.67 is not out of line.

■ As we noted at the hearing of July 27, 1993, and the Debtor does not apparently contest, the requirements of *In re F/S Airlease v. Simon*, 844 F.2d 99, 105–08 (3rd Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110; and *In re Arkansas Co.*, 798 F.2d 645, 648–51 (3rd Cir.1986), appear to clearly be met for the period from the date of the bankruptcy filing on November 25, 1991, through to April 15, 1992, when Gross first learned of the bankruptcy case. Our subsequent uncontested appointment of Gross as special counsel establishes that Gross met the statutory requirements of 11 U.S.C. § 327(a). *See F/S Airlease, supra*, 844 F.2d at 107; and *Arkansas Co., supra*, 798 F.2d at 648. Also, the particular circumstances in the case adequately excuse the failure to have sought prior approval. *See F/S Airlease, supra*, 844 F.2d at 107–08; and *Arkansas Co., supra*, 798 F.2d at 650. The evidence reveals that the Debtor concealed this lawsuit from this court and the Trustee by initially completely omitting reference to it in his Schedules, and his subsequent significant deflation of its value in his Amended Schedules. He also concealed the existence of his bankruptcy case from Gross, as long as he could. Consequently, Gross never learned of the Debtor's bankruptcy until he reluctantly admitted its existence during his deposition held in connection with the Alno Suit on April 15, 1992. Accordingly, this court finds that Gross' failure to obtain court approval after the filing of the petition and prior to April 15, 1992, did not result from any "inadvertence" or "oversight of counsel." Rather, Gross' lack of action was the consequence of the Debtor's apparently calculated failure to advise it of his bankruptcy filing. Further, it is clear that the services rendered by Gross were needed immediately by the Debtor, since they were rendered in connection with the then-pending Alno Suit. Approval of Gross' compensation will not harm any innocent parties, since the Debtor is, in our view, not innocent in this matter, and all of the innocent unsecured creditors will be paid in full with interest. Moreover, it was the legal services rendered by Gross in connection with the Alno Suit which generated all of the funds from which the creditors and the Debtors will be paid.

■ We agree that Gross failed to properly document the "telephone/telecopier," "photocopying," and "postage" costs for which it seeks reimbursement. *See In re Mayflower Associates*, 78 B.R. 41, 47–48 (Bankr.E.D.Pa.1987). For example, it is unclear how much arose during the prepetition period or the period between April 15, 1992, and September 25, 1992, during which periods compensation and reimbursement for costs appears to be inappropriate. Consequently, we will reduce allowable costs from $2,174.89 to $1,500. However, that is the only adjustment which we are inclined to make in allowance of Gross' request for compensation.

*2. NEITHER THE TRUSTEE NOR GROSS ARE ENTITLED TO INTEREST ON THEIR RESPECTIVE FEE AWARDS, SINCE SUCH CLAIMS DO NOT BEGIN TO ACCRUE UNTIL THEY ARE AWARDED BY THE COURT.*

■ One of the general rules of bankruptcy is that unsecured creditors are gen-

erally not entitled to receive post-petition interest on their allowed claims. *See*, 11 U.S.C. § 502(b); *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946); and *Shaffer Furniture, supra*, 68 B.R. at 830. However, an exception to that general rule is located at 11 U.S.C. § 726(a)(5), which provides as follows:

§ 726. **Distribution of property of the estate.**

(a) Except as provided in section 520 of this title, property of the estate shall be distributed—

. . . . .

(5) fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; ...

In order for an unsecured creditor to receive interest pursuant to § 726(a)(5), one of three circumstances must occur: (1) the debtor must prove to be solvent; (2) the collateral securing the debt must produce income after the filing of the petition; or (3) the collateral is sufficient to pay interest as well as the principal of the claim. *In re Kentucky Lumber Co.*, 860 F.2d 674, 676–677 (6th Cir.1988); and *In re Dodge*, 101 B.R. 800, 801 n. 1 (Bankr. S.D.Fla.1989). Where the debtor, like the Debtor here, proves to be solvent, payment of interest to creditors is therefore in order. *See, e.g., In re Comstock Financial Services, Inc.*, 111 B.R. 849, 860 (Bankr. C.D.Cal.1990); and *Shaffer Furniture, supra*, 68 B.R. at 830. Therefore, payment of interest to at least holders of unsecured claims against the Debtor, pursuant to 11 U.S.C. § 726(a)(5), is appropriate.

Courts have recognized that administrative claims, including attorneys' fees pursuant to 11 U.S.C. § 330(a), are entitled to interest under § 726(a)(5) when there is a surplus in the estate. *See In re Riverside–Linden Investment Co.*, 945 F.2d 320, 323 (9th Cir.1991); and *In re Beck*, 128 B.R. 571, 573 (Bankr.E.D.Okla. 1991). But, while determining that administrative claims are entitled to interest, the courts have nevertheless been faced with a quandary. Specifically, the courts are required to pay interest under § 726(a)(5) "at the legal rate *from the date of the filing of the petition* on any claim paid under ... this subsection" (emphasis added). However, professional compensation allowable under § 330(a) often does not arise as a claim until near or at the end of the case, when a court enters a fee award.

In *Riverside–Linden, supra*, the court addressed this dilemma. There, the attorney for a Chapter 7 trustee requested § 726(a)(5) interest from the date that the fees and costs were invoiced, *id.* at 322, which we note is a more modest request than that of the instant Trustee on behalf of herself and her special counsel, who proposes to have interest accrued from the date of the professionals' respective appointments. Nevertheless, noting that § 330 claims do not arise until *after* the filing of the petition, when a court enters a fee award, the court concluded that, in the context of claims pursuant to § 330(a), literal application of allowance of interest for claims "from the date of filing" makes "little sense." *Id.* at 323. The court further stated that statutes "should never be construed as establishing statutory schemes that are illogical, unjust or capricious." *Id.* at 324. Therefore, the court concluded that, in order to provide a logical application of § 726(a)(5) to § 330(a) claims, since "[i]t is not until the fees have been awarded by the bankruptcy court pursuant to § 330 ... [that they are entitled] to treatment as a claim under § 726(a)(5)," interest on such fees does not begin to accrue until the date the court makes the award. *Id. Accord, In re Motley*, 150 B.R. 16, 19 (Bankr.E.D.Va.1992); *In re Commercial Consortium of California*, 135 B.R. 120, 127 (Bankr.C.D.Cal.1991) and *In re Energy Cooperative, Inc.*, 95 B.R. 961, 966–68 (Bankr.N.D.Ill.1988).

The court finds that the approach and the reasoning adopted by the aforesaid courts is applicable to the instant matter. This court has not, until the within Order, approved fees to either the Trustee or Gross. Consequently, the "award of a

claim" necessary to trigger the application of § 726(a)(5) to these claims will not accrue until the Distribution Order itself is calculated. Therefore, as both the Debtor and the UST contend, the Trustee and Gross are not entitled to interest on their fee awards. *See also Motley, supra,* 150 B.R. at 20 (interest cannot be paid to a trustee because doing so would cause the trustee to exceed the absolute limitation on compensation posed by 11 U.S.C. § 326(a)).

### 3. THE INTEREST AWARDED TO THE UNSECURED CREDITORS MUST BE CALCULATED AT THE FEDERAL JUDGMENT RATE, NOT THE APPLICABLE STATE LAW JUDGMENT RATE.

 The Trustee, in the Audit, has calculated the unsecured creditors' interest, pursuant to § 726(a)(5), at six (6%) percent per annum, the statutory rate of interest in Pennsylvania. *See* 41 P.S. § 202; and *Shaffer Furniture,* 68 B.R. at 831. The Debtor has objected to the rate of interest utilized by Trustee. The Trustee and the UST, relying on this court's decision in *Shaffer Furniture, id.,* argue that the Trustee utilized the appropriate rate of interest.

In *Shaffer Furniture* this court indeed did apply the six (6%) percent state-law rate. *Id.* However, in that case, none of the interested parties presented this court with any alternatives for calculation of interest due to the creditors. *Id.* Since this court's decision in *Shaffer Furniture,* several courts *have* addressed the issue of how the specific "legal rate of interest" to be awarded under § 726(a) is to be defined and hence calculated. These decisions have produced two different lines of reasonings. One line provides that the "legal rate of interest" is the rate set forth in the contract between the parties if such a contract exists. *In re A & L Properties,* 96 B.R. 287, 289–90 (C.D.Cal.1988). *Accord, Beck, supra,* 128 B.R. at 573. And, where there is no contract between the parties, the definition of "legal rate of interest" is consistent with *Shaffer Furniture,* the rate provided to creditors by applicable state stat-

ute. *A & L Properties, supra,* 96 B.R. at 290; *In re Adcom, Inc.,* 89 B.R. 2 (D.Mass. 1988); and *Beck, supra,* 128 B.R. at 573–74.

However, an alternative definition of the term "legal rate of interest" under § 726(a)(5) arises from reference to the federal judgment rate. *See In re Melenyzer,* 143 B.R. 829, 832–33 (Bankr.W.D.Tex. 1992); and *In re Godsey,* 134 B.R. 865, 867–68 (Bankr.M.D.Tenn.1991).

In *Godsey, supra,* 134 B.R. at 867, the court found as follows:

> Without a clear statutory definition of "the legal rate" in the United States Code, this court will look to the federal statutory interest rate that is most closely related to the bankruptcy context, 28 U.S.C. § 1961 (1991).

Similarly, in *Melenyzer,* 143 B.R. at 832, the court stated that the award of interest under § 726(a)(5) "arises under federal law" and hence should be resolved under federal law. The Court further points out, *id.* at 833, that

> use of the federal judgment rate not only assures a ratable distribution, but it also meets the requirement that federal law decide a federal issue. *In re Laymon,* 117 B.R. [856,] at 862 [ (Bankr.W.D.Tex. 1990) ].

. . . . .

> Bankruptcy gives all creditors what amounts to a judgment against the debtor as of the filing date. 11 U.S.C. § 502(a). In all other judgment situations, the interest rate is calculated [utilizing the federal rate] as of the date of judgment—*i.e.,* the date when the obligation was created—not the date upon which the judgment is paid. . . .

This court concurs with the decisions in *Godsey* and *Melenyzer* that the "legal rate of interest" is the federal judgment rate, an alternative which was not proposed by any of the parties and, frankly, did not occur to us in deciding *Shaffer Furniture. Accord, Beck, supra,* 128 B.R. at 573. *Cf. In re D. C. Sullivan & Co.,* 929 F.2d 1, 6 (1st Cir.1991) (administrative claim against solvent debtor allowed interest at 28 U.S.C.

§ 1961 rate). Following the holding in *Melenyzer,* we further conclude that, since a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate in effect at the time of the bankruptcy filing. A review of federal judgement rates at different time-periods indicates that the rate in effect at the time of the Debtor's bankruptcy filing on November 25, 1991, was 5.42 percent. *See* 28 U.S.C. § 1961. This is the rate at which the Trustee should calculate the interest payable to the unsecured creditors under 11 U.S.C. § 726(a)(5).

### D. CONCLUSION

We shall Order the Trustee to prepare an Amended Order of Distribution consistent with the conclusions reached in the aforesaid Opinion. Thereafter, the attached Order provides that interested parties will be duly given an opportunity to object to the new calculations prepared by the Trustee.

### ORDER

AND NOW, this 1st day of September, 1993, after a contested Final Audit hearing of July 27, 1993, and consideration of the various subsequent submissions of the parties relevant thereto, it is hereby ORDERED as follows:

1. The Trustee is awarded Commissions of $1,364.26, plus expenses of $74.54.

2. Bernard W. Gross, P.C. is awarded compensation of $16,666.67, plus expenses of $1,500.

3. The Trustee is directed to file and serve upon the interested counsel listed below, the United States Trustee ("the UST"), and the court in chambers, on or before September 9, 1993, a proposed Amended Order of Distribution, making all necessary corrections and allowing interest to the pre-petition claimants only at a rate of 5.42 percent, calculated from November 25, 1991, to September 20, 1993.

4. Any interested party may file and serve on the court in chambers any Objections to the proposed Order on or before September 16, 1993, or the Order will be entered on September 20, 1993, as proposed.

5. Subsequent to distribution, the Trustee shall file, and serve upon the court in chambers a certification of filing of, the cancelled checks and zero bank statement; or an affidavit, pertaining to disbursements made pursuant to the Plan, setting forth that there is a zero balance in the account and that the cancelled checks are no longer available, on or before January 1, 1994.