### In re CHILD WORLD, INC.

**Bankruptcy No. 92–B–20887 (JJC).**

United States Bankruptcy Court,
S.D. New York.

Aug. 9, 1995.

Weil, Gotshal & Manges by Martin Bienenstock, New York City, for Child World, Inc.

Otterbourg, Steindler, Houston & Rosen, P.C. by Scott Hazan, New York City, for Official Unsecured Creditors' Committee.

Ernst & Young, accountants, New York City, for Official Unsecured Creditors' Committee.

U.S. Trustee for the S.D.N.Y. by Doria Stetch and Norma Ortiz, New York City.

## DECISION ON ENTITLEMENT OF PROFESSIONALS TO INTEREST ON HELD BACK FEES

JOHN J. CONNELLY, Bankruptcy Judge, Sitting by Special Designation.

At issue is whether three retained firms ("Movants") are entitled to be paid interest on the portion of fees that this Court directed to be withheld at interim fee hearings (the "Holdbacks") pending a final hearing to approve the overall fees and disbursements in this case. The Movants essentially argue that the awarding of interest on the Holdbacks is necessary and appropriate to compensate them in a manner that is consistent with their firm's fee structure in non-bankruptcy related matters.[1] In opposition to the request, the office of the United States Trustee ("Trustee") argues that since retained professionals do not have a claim against the estate until an Order awarding final fees under Section 330 of the Bankruptcy Code is entered, interest cannot be paid on sums which, legally, have yet to be "earned." The Trustee also asks me to reduce the fees awarded to one of the Movants on the ground that there may have been over-staffing in this case. For the following reasons, I hold that professionals are not entitled to be paid interest on deferred compensation and that the questioned fees are reasonable.

### BACKGROUND

The salient facts for purposes of this motion are not in dispute. Child World, Inc. ("Child World"), a publicly traded company that was the nation's second largest retail toy supermarket chain, filed its voluntary Chapter 11 petition on May 6, 1992. Throughout the case, Child World was authorized to operate as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. On the date

of the filing, the late Judge Schwartzberg signed an order authorizing Child World to retain the services of Weil Gotshal & Manges ("Weil Gotshal") as its attorneys in this case. On May 14, 1992, the Trustee appointed an unsecured creditors committee pursuant to 11 U.S.C. § 1102 ("Committee"). On June 15, 1992, Judge Schwartzberg signed an Order authorizing the Committee to retain Otterbourg, Steindler, Houston & Rosen, P.C. ("Otterbourg") as its attorneys in this case. Judge Schwartzberg also signed an Order on June 15, 1992 authorizing the Committee to retain Ernst & Young ("Ernst") as their accountants. These three firms seek the instant ruling on whether they can be paid interest on the Holdbacks.

While I am handicapped somewhat by the fact that I have overseen only a limited part of this case (which for the most part was overseen by Judge Schwartzberg), Child World's tenure in bankruptcy is best described as having yielded a successful but not extraordinary outcome. As counsel to the Committee described the case: "[u]nfortunately, notwithstanding the efforts of the Debtor, the Debtor's professionals, the Committee, the Committee's professionals and numerous other parties in interest, the Debtor did not succeed in its effort to reorganize under protection of the Bankruptcy Code. Instead, the Debtor has implemented an orderly liquidation in accordance with Chapter 11 of the Bankruptcy Code." (Appl. for Fourth Interim Allow. of Compen. of Otterbourg at ¶ 6). Counsel to the Committee also noted that while it appeared unlikely at the outset of this case that unsecured creditors would receive a distribution, "the orderly liquidation of the Debtor's assets has resulted in a pool of at least $13 million which will be distributed to unsecured creditors." (Final Appl. for Allow. of Compen. of Otterbourg at ¶ 3).

---

1. The Movants also argued at the final fee hearings that the interest issue was decided because the plan of reorganization, disclosure statement and confirmation order all reflected that interest would be paid on the Holdbacks. (Discl. at 45–46); (Plan at 13–14) (specifying that allowed administrative claims would be paid "in full, in Cash with interest from the date allowed by the Bankruptcy Court …") For reasons which I do not find illuminating to the instant analysis, the

Movants have since abandoned this argument by waiving the relevant provision of the confirmation order. (Letter to the Court dated October 25, 1994) Accordingly, I refrain from further discussing the sequence of events which led to the waiver and assume, without having to articulate my own reasons therefor, that the relevant provision of the confirmation order is not *res judicata* on the interest issue.

Child World confirmed a liquidating plan of reorganization ("Plan") on June 24, 1994. That Plan established nine classes of claims and interests. (Plan ¶ 2.1–2.9). The treatment of the creditors under the plan varied across a broad spectrum ranging from full to pro rata payments which were contingent upon values received as a result of the liquidation. Without unnecessarily delving into the minutia, the plan defined six classes of claims to be unimpaired, two classes of claims to be impaired and one class, the equity interest class, was "deemed to reject." (Discl.Stmt. pp. 10–17). Of particular relevance here is that the Plan (which was not dissimilar to most Chapter 11 plans in this respect) slated the administrative creditors (including the Movants) to be paid in full on the effective date or in due course thereafter while it slated the unsecured class to be paid a fraction of their claim.[2] In addition, the Plan provided that the unsecured creditor dividend would be, in part, contingent upon the success of the liquidation.

Throughout the case, there were four interim fee application hearings at which Judge Schwartzberg (and Judge Gallet, on one occasion) reviewed the requests for fee allowances and reimbursement of expenditures. It is not unreasonable to conclude that significant fee allowances and expenditure reimbursements were paid in accordance with the Judges' Orders at those hearings. Yet, the interim fee hearings also saw the judges order the Holdbacks which totalled roughly $900,000 (versus payments of $3.53 million prior to the final hearing). (Order Grant.Allow.Fin.Comp.)

At the final hearing held on August 17, 1995, I reviewed the applications of 10 professional firms for approval of fees and expenditures incurred throughout the case. As part of their final application, the Movants and one other professional firm sought approval of their overall fees earned in the case as well as fees and expenditures incurred in the final six month period of the case; all other applicants solely sought approval of the fees earned from the inception of the case. With respect to the Movants' applications, Weil Gotshal sought final approval of roughly $2.57 million in fees for the case of which $300,211 represented fees for the last interim period, and $569,355 represented Holdbacks. (Order Grant.All.Fin.Comp.Sch. A P 2). Otterbourg sought approval of $942,767 in fees for the case of which $77,196 represented fees for the last interim period, and $216,394 represented Holdbacks. *Id.* Ernst sought approval of $519,707 in fees of which $56,807 represented fees for the last interim period, and $115,726 represented Holdbacks. *Id.* Utilizing a 5% annual rate, the Movants also sought the disputed interest on the Holdbacks in the amount of $38,411, $16,328 and $9,448, respectively. (Order Grant.Allow.Fin.Comp. at p. 4).

## DISCUSSION

### A. *Fee Considerations Generally*

Prior to the enactment of the Bankruptcy Code in 1978, a spirit of "economy of administration" governed the awarding of attorney fees in an effort to conserve the assets of the estate. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. at 329–30 (1977) ("House Reports") (overruling *Matter of Beverly Crest Convalescent Hospital, Inc.,* 548 F.2d 817 (9th Cir.1976)); *See e.g. Massachusetts Mutual Life Insurance Company v. Brock,* 405 F.2d 429 (5th Cir.1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969); *In re Emergency Beacon Corp.,* 43 B.R. 672, 675 (Bankr.S.D.N.Y.1984), *aff'd* 71 B.R. 117 (S.D.N.Y.1987). Acting under this austere command, courts generally awarded bankruptcy attorneys fees calculated at rates lower than those employed in other fields. *See In re Kero–Sun, Inc.,* 59 B.R. 630, 632 (Bankr.D.Conn.1986). In addition, under the Bankruptcy Act of 1898 ("The Act"), professionals generally were compensated only at the conclusion of the case. House Reports at

---

2. I would note that the dividend to be paid to the unsecured class was never quantified, either precisely or in a range, in the plan of reorganization or the disclosure statement. The Trustee has suggested that the projected dividend was in the vicinity of 5–7%. (Mem.Law Sup.Obj. at 8) Weil Gotshal, although it does not dispute this range, counters that this fact must be considered in conjunction with the fact that trade and bank creditors have received a significantly higher return on a blended basis. (Repl. Weil Gotshal to Obj. at 13–14).

330; *In re Commercial Consortium of California*, 135 B.R. 120, 123 (Bankr.C.D.Cal. 1991), (citing *In re THC Financial Corp.*, 659 F.2d 951, 955 n. 2 (9th Cir.1981), *cert. denied*, 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982)); *cf. Brock*, 405 F.2d 429. Congress addressed both these anomalous practices when it changed the laws in 1978 and permitted professionals to be compensated in a manner consistent with fee practices employed in other areas of the legal profession. House Reports at 329–30. "The rationale for the change was the understanding, premised on the most fundamental principles of economics, that the payment of arbitrarily lower rates to lawyers 'in' bankruptcy proceedings versus those established by the market for 'non bankruptcy' legal services would result in attorneys leaving (or never entering) bankruptcy practice." *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 18 (Bankr.S.D.N.Y.1991).

The departure from the philosophy of frugality that existed under the Act is evidenced by the enactment of Bankruptcy Code Section 330 which provides in pertinent part that "the court may award ... reasonable compensation for actual, necessary services, rendered ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title...." 11 U.S.C. 330(a)(1) (West 1993).[3] In another change from existing practice, Congress relieved retained professionals "of the burden of 'financing' lengthy bankruptcy proceedings" by permitting the professionals to submit interim requests for compensation. *See Commercial Consortium*, 135 B.R. at 123 (listing authority); *accord In re Public Service Co. of New Hampshire*, 138 B.R. 660, 662 (Bankr.D.N.H.1992) (recognizing that interim allowances are intended to alleviate hardship to the professionals involved in lengthy reorganizations); M. Bienenstock, *Bankruptcy Reorganization* at 585 n. 34 (1987) (for ease of reference *Bienenstock* at 585 n. 34). Yet, even with these significant changes, Congress continued many of the

"fee strictures" that existed under the Act including the requirement to obtain court approval of the reasonableness of professional fees at the end of the case. L. Brickman, *The Use of Advance Fee Attorney Retainer Agreements in Bankruptcy: Another Special Law for Lawyers*, 43 S.C.L.Rev. 1037, 1056 (1992); *Id.* at 1061–62 (1992) (delineating the various components of the professional compensation process in the bankruptcy arena); *Bienenstock* at 788 n. 206 ("To make fee determinations appear as fair as possible the judiciary should retain control of fees, given the sensitivities they generate and the need to promote public confidence in the system.").

**B.** *Interim Allowances, Holdbacks and Interest*

By enacting Code § 331, Congress "removed any doubt" that courts may approve applications for interim compensation instead of requiring that professionals wait until the end of the case. See House Reports at 330. Specifically, this provision provides:

> A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

11 U.S.C. § 331. Yet, the language of Code § 331 is permissive; nothing in that provision *requires* a court to grant an application for interim compensation. *See e.g., Callister v. Ingersoll–Rand Financial Corporation (In re Callister)*, 673 F.2d 305, 306 (10th Cir. 1982); *In re First Hartford Corp.*, 23 B.R. 729, 732 (Bankr.S.D.N.Y.1982).

---

**3.** Congress has recently revised Section 330 of the Bankruptcy Code. Since Congress has not indicated that these changes should be given retroactive effect, I am reciting and applying the law in existence at the filing of this case. In any event, the amendment does not alter the result here.

In exercising the discretion to grant interim compensation, courts often "holdback" a portion of an interim allowance pending final review of the reasonableness of the aggregate fees and disbursements paid to a particular applicant. Such holdbacks, while not mandated by statute (and subject to some criticism), are commonly used by courts to moderate potentially excessive interim allowances and to offer an incentive for timely resolution of the case. *See* G. Ray Warner, *Interim Compensation and the Routine Holdback: The Effect of the Jenkins Case*, 1 J.Bankr.L. & Prac. 565, 566 (1992); *cf.* 2 Queenan, *Chapter 11 Theory and Practice*, § 12.37 at 12–77 (1993) (for ease of reference *Queenan* at 12–77) (suggesting that holdbacks are justified only where there is a threat of administrative insolvency). In the end, the holdbacks are either directed by the court to be paid in full, in part or denied altogether (with the potential for additional disgorgement) depending upon an array of factors including: the total interim fees paid the applicant, the total and priority of the final fees awarded and the level of solvency of the estate.

Some courts and commentators have taken the position that professionals should be compensated for their delay in receiving fees held back at interim fee application hearings, but later approved at final hearings. *See Commercial Consortium*, 135 B.R. at 127 (court allowed the use of current rather than historical billing rates to compensate for delay in payment); *In re Energy Cooperative, Inc.*, 95 B.R. 961, 966–67 (Bankr.N.D.Ill. 1988) (same and allowing interest from date of final award); *In re Fall*, 93 B.R. 1003, 1010 (Bankr.D.Ore.1988) (same); Queenan, § 12.28 at 12–64 to 12–65, 12–65 n. 333 (citing other cases). Their positions are based on both notions of equity and analogies to non-bankruptcy cases, most notably *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), in which the Supreme Court held that under the fee-shifting provisions of the civil rights law, 42 U.S.C. § 1988, "an appropriate adjustment for delay in payment—whether by application of current rather than historic hourly rates or otherwise is within the contemplation of the statute." *Id.* at 284, 109 S.Ct. at

2469. The bankruptcy decisions, however, do not stand for the proposition that interest can be paid on holdbacks. Rather they suggest that fees awarded at the end of the case can be "enhanced" in extraordinary circumstances which may include a significant delay in payment. While I do not mean to suggest that the facts in this case warrant a fee enhancement, I decline to reach the issue since the Movants have expressly elected not to pursue a request for a bonus. (Transcript of Hearing ("Tr.") at 64).

I turn then to the question of whether the Bankruptcy Code authorizes professionals to be paid interest on holdbacks. I conclude that it does not. The reason therefor is plain:

> [A] [c]ourt does not make interim fee *awards;* [it] makes interim fee *allowances* to applicants in extended and complex bankruptcy proceedings.... Any such interim allowances are then credited at the conclusion of the case when the [c]ourt does enter final fee awards. The final fee awards are determined only upon conclusion of the case when the Court can review the entire history of the case, the results obtained from the rendition of the professional services, and all other relevant factors bearing on the propriety of the final fee requests. Based on the foregoing, it is clear that no fees [are] 'due and owing' until [a] [c]ourt enter[s] its order awarding final fees. As there [is] no legal entitlement to payment prior to the final fee award ... any claim to 'interest' ... is, legally speaking, groundless.

*In re Public Service Co. of New Hampshire,* 138 B.R. 660, 661–62 (Bankr.D.N.H.1992) (emphasis in the original); *accord Boldt v. Crake (In re Riverside–Linden Investment Co.),* 945 F.2d 320, 324 (9th Cir.1991); *In re Chiapetta,* 159 B.R. 152, 159 (Bankr.E.D.Pa. 1993); *Huisinga v. Craig & Nichols, P.C. (In re Byrd),* 151 B.R. 925, 927 (D.S.D.1993), *In re Motley,* 150 B.R. 16, 18–19 (Bankr.E.D.Va. 1992) (same); *In re Bank of New England Corp.,* 134 B.R. 450, 458–59 (Bankr. E.D.Mass.1991); *Commercial Consortium,* 135 B.R. at 127 (denying interest but allowing fee enhancement); *Energy Cooperative,* 95 B.R. at 966–68 (same). In sum, I follow

the cases which hold that statutory interest on fees can only begin to accrue upon the issuance of a final fee award pursuant to Code § 330.

I am not persuaded otherwise by the Movants' citation to *Lifetime Communities, Inc. v. Weil, Gotshal & Manges (In re Fidelity Mortgage Investors)*, 12 B.R. 641, 647 (S.D.N.Y.1981). While it is true that the District Court highlighted the absence of a provision in the plan of arrangement which alerted creditors to a future request for interest, the facts here are distinguishable from *Lifetime*. In that case there was no interim allowance, let alone a holdback; the request for interest was pegged to the date of confirmation and "Deposit" and calculated forward to the date final fees were actually awarded. *Lifetime*, 12 B.R. at 643. Moreover, the District Court only discussed the absence of a provision in the plan of arrangement after it had concluded that the law did not permit interest to accrue prior to an award of fees at a final hearing. *Id.* at 644. The Court then went on to state:

> It is a known fact that Chapter XI proceedings, depending upon their size, complexity, and the number of claims and creditors, require substantial time before a Plan may receive final acceptance. Similarly, delay in considering petitions by attorneys for fees is not unusual. This delay does not thereby entitle interested persons, particularly administrative claimants such as debtor's attorneys who frequently control the direction and progress of proceedings, to interest upon amounts finally awarded them. To grant interest, whether from the date of inception of proceedings or from the time applications for allowances are made, absent specific legislative authority, would in effect amount to judicial legislation.

*Lifetime*, 12 B.R. at 646–47. Thus, I am not persuaded that this case supports the Movants' position.

As a final point on this topic, I am also not swayed by the argument that "the equities of this case support [a] 'small increment of interest' to make the professionals whole." (Tr. at 67). At the outset, even if I am supposed to consider such factors, the Mov-ants' reliance on notions of equity is undercut by the fact that unsecured creditors are receiving significantly less than full payment. Moreover, the stream of payments received by this class stretched over a far greater period than that which is complained of here. Furthermore, while I gave counsel from Weil Gotshal and Otterbourg the opportunity to introduce evidence that their firms customarily charge interest to non-bankruptcy clients where there is a delay in payment, I am unpersuaded by the responses. (Tr. at 58 and 60). Thus, the record here does not support a finding on this issue, although I would add that I am not inclined to believe that the Bankruptcy Code requires absolute conformity with non-bankruptcy payment practices. Accordingly, there is no basis to grant the Movants' request.

### C. The Remaining Objection

That leaves only the Trustee's objection to Weil Gotshal's fee request on the ground that the firm assigned too many paralegals and summer associates to work on this Case. While the numbers do appear at first blush to be somewhat high, I find that the total fees sought are reasonable within the meaning of 11 U.S.C. § 330 based upon the testimony and also the endorsement of Mr. Michael J. Sherman, Chief Executive Officer of Child World.

### CONCLUSION

Accordingly, I hold that as a matter of law the Bankruptcy Code does not entitle the Movants to be paid interest on the Holdbacks. I also find that Weil Gotshal's fees are reasonable.

IT IS SO ORDERED.