*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0337P (6th Cir.)
File Name: 04a0337p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

INTERNATIONAL UNION;
UNITED AUTOMOBILE,
AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA;
LOCAL 6000,
  *Plaintiffs-Appellants,*

No. 03-1574

*v.*

JANINE WINTERS, et al., in
their Official Capacities,
Jointly and Severally,
  *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 00-00021—David W. McKeague, District Judge.

Argued: August 5, 2004

Decided and Filed: September 30, 2004

Before: KENNEDY, SUTTON, and COOK, Circuit
Judges.

## COUNSEL

**ARGUED:** George B. Washington, SCHEFF & WASHINGTON, Detroit, Michigan, for Appellants. Susan Przekop Shaw, OFFICE OF THE ATTORNEY GENERAL, LABOR DIVISION, Lansing, Michigan, for Appellees. **ON BRIEF:** George B. Washington, SCHEFF & WASHINGTON, Detroit, Michigan, for Appellants. Susan Przekop Shaw, OFFICE OF THE ATTORNEY GENERAL, LABOR DIVISION, Lansing, Michigan, Denise C. Barton, OFFICE OF THE ATTORNEY GENERAL, PUBLIC EMPLOYMENT & ELECTIONS DIVISION, Lansing, Michigan, for Appellees.

## OPINION

KENNEDY, Circuit Judge. The Plaintiffs, International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW), and its affiliated Local 6000 (hereinafter referred to collectively as "UAW"), appeal from the district court's judgment holding that a random drug testing program implemented for select Michigan civil service employees, including probation and parole officers, non-custodial employees in prisons, and medical personnel who deliver medical or psychological services to persons in state custody, does not violate the Fourth Amendment. The district court reached this conclusion as it found that the state established sufficient "special needs," based upon substantial public safety concerns, which overrode the intrusion on the Fourth Amendment rights of the employees subject to the drug

testing.[1] We agree with the district court's conclusion, and AFFIRM.

## BACKGROUND

The UAW represents approximately 20,000 State of Michigan employees. Under the Michigan Constitution, the Michigan Civil Service Commission has the power to regulate the terms and conditions of employment for the State's civil service. On May 20, 1999, the Commission adopted a random drug and alcohol testing program, essentially borrowing protocols and procedures issued by the United States Department of Health and Human Services and Department of Transportation. The testing program was incorporated into the 1999-2001 Collective Bargaining Agreement between the UAW and the State of Michigan. Article 52 of the Agreement identifies seven categories of "test-designated positions" that are subject to testing. The UAW represents 2,855 employees who occupy test-designated positions, all in the following four categories:[2]

Category 2: A position in which the incumbent possesses law enforcement powers or is required or permitted to carry a firearm while on duty.

---

[1] The parties submitted the matter to the district court for judgment based on stipulated facts and briefs in lieu of trial.

[2] Although the UAW criticizes the district court for not examining every "job," the district court did not need to evaluate each individual position because the UAW agreed to a stipulation that each of the 2,855 positions, occupied by employees it represents, requires duties, in varying amounts, within one or more of the four challenged categories. Indeed, the UAW made this stipulation and agreed to admit a representative sample of position descriptions. Thus, the UAW waived the argument concerning the need to evaluate each job description.

Category 3: A position in which the incumbent, on a regular basis, provides direct health care services to persons in the care or custody of the state or one of its political subdivisions.

Category 4: A position in which the incumbent has regular unsupervised access to and direct contact with prisoners, probationers, and parolees.

Category 5: A position in which the incumbent has unsupervised access to controlled substances.

The largest group of UAW represented employees now being tested consist of probation or parole officers and field service assistants. These employees are subject to testing either because they have law enforcement powers, are required or permitted to carry a firearm while on duty, or have regular unsupervised access to and direct contact with probationers or parolees. The UAW does not challenge the testing of those parole or probation officers who applied for and maintain their eligibility to carry firearms. Rather, it challenges the testing of those employees who are subject to testing only because they possess law enforcement powers or have access to and contact with probationers or parolees.

The next largest group subject to testing consists of non-custodial employees who work for the Department of Corrections or the Department of Community Health within the perimeter of the state's correctional facilities.[3] These

---

[3] These employees include Athletic and Program Coordinators, Chaplains, Prison Counselors, Recreational Therapists, Special Education Teachers, Dietician/Nutritionists, State Transitional Professionals, Employment Counselors, Communication Assistants, and General Office Assistants.

employees are subject to testing because they have regular unsupervised access to and direct contact with prisoners.

A third group of test-designated positions consists of Department of Corrections and Department of Community Health employees who provide health care and psychological care to prisoners. These positions include nurses, occupational therapists, psychologists and social workers.

Finally, a fourth group consists of Department of Community Health, Department of Education, and Department of Military and Veterans Affairs employees who provide health care and other services to residents at state hospitals for the mentally ill and developmentally disabled and to residents of veterans' homes. These positions include psychiatrists, psychologists, physicians, dentists, nurses, therapists, and social workers.

After the district court denied UAW's claim for declaratory and injunctive relief and awarded judgment for the State, this appeal followed. Since the issue in this case concerns the reasonableness of a Fourth Amendment search, we review the district court's decision *de novo*. *Knox County Education Ass'n v. Knox County Bd. of Education*, 158 F.3d 361, 371 (6th Cir. 1998).

## ANALYSIS

The Fourth Amendment to the United States Constitution protects "[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It is beyond dispute that government ordered collection and testing of urine samples effects a search within the meaning of the Fourth Amendment as such tests intrude upon reasonable expectations of privacy that society has long recognized as reasonable. *See Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 619 (1989); *National Treasury Employees Union v. Von Raab*,

689 U.S. 656, 665 (1989). Because these intrusions are searches under the Fourth Amendment, we must therefore review the State's policy for reasonableness, "which is the touchstone of the constitutionality of a governmental search." *Board of Education v. Earls*, 536 U.S. 822, 828 (2002). The *Earls* Court noted that in "the criminal context, reasonableness usually requires a showing of probable cause." *Id.* However, the probable cause standard, the court further noted, "'is peculiarly related to criminal investigations' and may be unsuited to determining the reasonableness of administrative searches where the 'Government seeks to *prevent* the development of hazardous conditions.'" *Id.* (citing *Von Raab*, 489 U.S. at 667-68). Thus, "in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Von Raab*, 489 U.S. at 668. Therefore, the Court has recognized, a search unsupported by individualized suspicion may nonetheless be reasonable when the government alleges "special needs," beyond the normal need for law enforcement, that are both substantial – important enough to override the individual's privacy interest, and sufficiently vital to suppress the normal requirements of individualized suspicion. *Chandler v. Miller*, 520 U.S. 305, 318 (1997).

In reviewing the reasonableness of a drug testing policy, the Court has instructed that we weigh the extent of the intrusion upon the privacy interest of the individuals being tested against the promotion of the government's proffered special need in conducting the tests. *Earls*, 536 U.S. at 830. For instance, a program may be unconstitutional even if the intrusion upon the individual's privacy rights were minimal, if the government fails to establish a sufficient special need justifying the intrusion without individualized suspicion. *See e.g. Chandler*, 520 U.S. at 318-19. A drug testing program may also be unconstitutional, conversely, even if the

government establishes a sufficient special need, if the intrusion upon the individual's privacy interest were excessive, for instance, because of an overly intrusive testing procedure. In deciding whether the State's testing program here was justified by a sufficient special need that outweighed the privacy interest of those being tested, it is helpful to briefly review precedent in this area to see how the Supreme Court and our court have balanced these competing interests.

In *Chandler*, the Court concluded that the state failed to proffer a special need that would overcome the general prohibition against suspicionless searches. 520 U.S. at 322. The special need in *Chandler* failed because the state's interest was found to be merely symbolic, not special. *Id.* In *Chandler*, the State of Georgia required all candidates who sought to qualify for nomination or election to a state office to certify that they had tested negative for drugs. *Id.* at 309. In defense of the policy, Georgia asserted that the use of drugs is incompatible with holding state office since the use of drugs calls into question an official's judgment and jeopardizes the discharge of public functions. *Id.* at 318-19. Notably lacking from Georgia's defense, the Court noted, was any indication of a concrete danger that would arise by failing to test these candidates, thus demanding departure from the individualized suspicion requirement. *Id.* Rather, the court opined, since state officials are subject to day-to-day scrutiny, do not perform safety sensitive tasks, and are not alleged to have a drug problem, "[w]hat is left ... is the image the State seeks to project." This need, the Court concluded, is symbolic, not special. *Id.* at 321-22.

In *Von Raab*, by contrast, the Court found that the government not only offered a sufficient special need but also that the special need outweighed the intrusion upon the privacy rights of the employees subject to the testing. 489 U.S. at 677. In that case, the Customs Service implemented a program that made drug tests a condition of promotion or transfer to positions directly involving drug interdiction or

requiring the employee to carry a firearm. *Id.* at 660. The Court concluded that there was a sufficient special need to test these employees without individualized suspicion because their work involved drug interdiction; they were required to carry firearms; they could be subject to bribes or blackmail by the drug smugglers they were required to interdict; and they were not subject to the day-to-day scrutiny that is the norm in the more traditional office environment. *Id.* at 668-71, 74.

In *Earls*, the Court concluded that a school may test students for drugs who participate in extracurricular activities since the school's 'special need' to "prevent and deter" the use of drugs by students, where the school is responsible for maintaining the discipline, health, and safety of those students, outweighs the student's limited privacy interest. 536 U.S. at 834, 836. In reaching this conclusion, the Court first considered "the nature of the privacy interest allegedly compromised by the drug testing." *Id.* at 830. The Court noted that a "student's privacy interest is limited in a public school environment." *Id.* The Court further noted that a student's expectation of privacy is even further diminished if the student participates in extracurricular activities, since such activities are typically heavily regulated. *Id.*; *Cf. Veronica School Dist. 47J v. Action*, 515 U.S. 646, 657 ("Somewhat like adults who choose to participate in a closely regulated industry, students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy"). After considering the nature of the privacy interest, the Court next considered the character of the intrusion imposed by the drug test. *Id.* at 832. Under the policy, the Court noted, a faculty monitor waits outside a closed restroom stall for the student to produce a sample. *Id.* The Court considered this method of collection to be at most a negligible intrusion upon the student's privacy interest. *Id.* Given the student's decreased expectation of privacy and the minimally intrusive nature of the procedure, the Court concluded that the invasion upon the student's privacy was not significant. *Id.* at 834. Next, the Court

considered the special need proffered by the state. *Id.* It concluded that, despite the absence of an "identifiable drug abuse problem among ... [the students] subject to the testing," the need to prevent and deter the use of drugs among the students who participate in extracurricular activities to be sufficiently vital to suppress the requirements of individualized suspicion. *Id.* at 836. Finally, the Court found the drug testing program to be constitutional as it concluded that the school's special need outweighed the minimal intrusion upon the student's privacy interest. *Id.* at 836-38.

This Circuit has also had the opportunity to consider whether a proffered special need was sufficiently vital and substantial to permit drug testing of employees without individualized suspicion. In *Knox County*, a school board adopted a drug testing program that required the testing of employees who applied for, promoted to, or transferred to, safety sensitive positions, including teachers. 158 F.3d at 363. We concluded that the school board's proffered need to ensure the safety and security of the children under its care was sufficiently vital to overcome the traditional requirements of individualized suspicion. *Id.* at 374-79. After noting that teachers and other employees who work in a school have a diminished expectation of privacy because they work in a heavily regulated industry, we held that the school board's special need in ensuring the safety and security of the children under its care outweighed the intrusion upon the employees' privacy interest. *Id.* at 384.

With these cases as a guide, we now evaluate the special needs proffered by the State. In adopting the drug testing program, the Michigan Civil Service Commission followed the recommendations of the Employment Relations Board

Impasse Panel.[4] In recommending that the Civil Service Commission adopt the drug testing program proposed by the State, the Panel stated as follows:

> Employees in "test-designated" positions who abuse alcohol and drugs represent a significantly greater threat to the health and safety of themselves and others than do employees in nontest-designated positions. Employees in "test-designated" positions may be required to react to unusual or dangerous circumstances.

> On balance, the Impasse Panel finds that ... drug use by classified employees occupying "test-designated" positions can impair judgment and behavior so significantly that serious injury or death may result.

We cannot merely accept a state's invocation of special needs, but rather must engage in a context-specific inquiry, examining closely the interests advanced by the state. The largest group subject to testing consists of the parole or probation officers and field service assistants. They are subject to testing because they have law enforcement powers and because they have regular access to parolees or probationers. Probation and parole officers spend a significant amount of time supervising clients away from the office and away from supervision by their superiors. Moreover, they are often required to take urinalysis drug test samples from their clients in the field, over 20 percent of whom have tested positive for unlawful drug use. Since they are responsible for supervising probationers and paroles, public safety would be put in jeopardy, the state argues, if

---

[4] When the UAW and the State were unable to agree on a drug testing provision for the Collective Bargaining Agreement, a request was made for Impasse Panel assistance pursuant to the civil service rules governing collective bargaining. The Impasse Panel was composed of three members appointed by the Civil Service Commission.

they performed this duty while under the influence of drugs or alcohol.

The second largest group consists of non-custodial employees who work in the perimeter of a correctional facility. The State contends that there is a special need to test these employees because they have unsupervised access to and direct contact with prisoners, 80 percent of whom have a history of drug and alcohol abuse. Moreover, the introduction of alcohol and drugs into correctional facilities, which prisoners could obtain possession of, presents a severe threat to security and to the safety of correctional employees and prisoners, since the use of drugs by prisoners can lead to disruptive behavior. In addition, employees who are involved in substance abuse may be vulnerable to influence by others who would bring drugs into the prison. And finally, employees under the influence of drugs or alcohol suffer from impaired judgment, which could adversely impact security within the facility as well as the safety of other employees and prisoners.

Another group of test-designated positions consists of employees who provide health care and psychological care to prisoners. As with the non-custodial employees, these employees have unsupervised access to and direct contact with prisoners, which raises the concern of the introduction of drugs or alcohol into a correctional facility, which would pose a severe threat to the security and safety of the employees and prisoners therein. In addition, these employees have access to medications, including controlled substances. Finally, if these employees were under the influence of drugs or alcohol, the health and safety of the patients these employees provided health care to could be put in jeopardy.

The final group subject to testing consists of those employees who provide health care to residents at state hospitals for the mentally ill and developmentally disabled and to residents of veterans' homes. These employees have

direct patient care responsibilities in state facilities and have access to medications, including controlled substances. An employee involved in substance abuse might succumb to the temptation to take wrongful advantage of his or her access to these controlled substances. As with the health care providers who provide care to prisoners, there is a risk of harm to the patient if a care giving employee is under the influence of drugs or alcohol.

The Plaintiff argues that the State's justification for the drug testing program does not arise to a "special need," permitting the testing of employees without individualized suspicion. It contends that, since there was no pre-existing drug problem among the employees here, the drug testing program may only constitute a "special need" if it fits under the criteria established in *Von Raab,* since in that case the Court upheld a drug testing program even though there was no pre-existing drug problem among the employees subject to testing. The Plaintiff notes that the *Chandler* Court identified four factors that it felt were decisive in determining that the customs agents in *Von Raab* could be tested even though there was no existing drug problem among them: 1) drug interdiction had become the Customs Bureau's primary enforcement mission; 2) the employees subject to testing had access to vast sources of contraband; 3) the agents had been targets of bribery; and 4) it was not feasible to subject the custom agents to day-to-day scrutiny. After noting these factors, the Plaintiff concludes that the State has failed to show a special need as these factors do not apply at all or only minimally apply to the test-designated categories.

The Plaintiff errs in arguing that, since there is no pervasive pre-existing drug problem among the test-designated employees, the drug testing program here may only be justified if it accords with the factors that justified the drug testing program in *Von Raab.* We cannot, as the Plaintiff proposes, superimpose the four, context-specific factors outlined in *Von Raab* concerning customs agents onto the

facts here, which involve jobs that lay in an entirely different context, to determine if the state has proffered a special need that is sufficiently vital to suppress the requirements of individualized suspicion. It is obvious that the specific factors outlined in *Von Raab* would not all or even mostly apply to another context since they were specifically distilled from the situation facing customs agents. If those factors were the test for determining whether a special need existed when there is no evidence of a pre-existing problem, then it would likely be difficult to find any special needs outside those faced by the Customs Bureau. Instead, we must consider the state civil service employees in this case who are subject to testing in their own unique context. *Knox*, 158 F.3d at 374 ("Just as the Customs agents in *Von Raab* must be considered in their own unique context, so too must the nature of the work and positions of school teachers and administrators be viewed as unique.")

Although in *Earls*, like *Von Raab*, there was no evidence of a particularized or pervasive drug problem among those subject to testing, the Plaintiff nonetheless contends that *Earls* does not support the constitutionality of the drug testing program at issue here. The Plaintiff argues, on the basis of *Marks v. United States*, 430 U.S. 188, 193 (1977)[5], that Justice Breyer's concurrence provides the Court's holding. In his concurrence, Justice Breyer emphasizes some underlying considerations to his conclusion that no Fourth Amendment violation occurred in *Earls*. *Earls*, 536 U.S. at 838. He noted that there is a documented national drug problem among high school students, that students could opt out of the drug testing program by not participating in extracurricular activities, and that the testing program was not disciplinary in nature. The

---

[5] The *Marks* Court noted: "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgment on the narrowest ground."

Plaintiff argues that *Earls* does not support the imposition of the drug testing program because there is no evidence of a general drug problem among civil service employees, the employees may not opt out of the testing, and the testing may result in discipline. The Plaintiff's argument fails, however, not only because it attempts to apply the context specific factors announced in *Earls* to the unique context presented in this case, but also because it mischaracterizes the Court's holding. *Marks* does not apply to *Earls* since Justice Breyer concurred in the Court's opinion, not merely in the judgment. Justice Thomas' opinion of the Court not only provides the holding but also supports the proposition that a state may have a special need to deter and prevent drug use among a specific group despite the absence of a particularized or pervasive drug problem among the group.

After considering the drug testing program in its own unique context, we conclude that the State has offered "special needs" that are sufficiently vital to overcome the traditional requirements of individualized suspicion. Although there is no evidence of a particularized or pervasive drug abuse problem among the test-designated employees, it is well established that the existence of a pronounced drug problem is not an essential element to the finding of a special need. *Knox*, 158 F.3d at 374; *See also Earls*, 536 U.S. at 835; *Von Raab*, 489 U.S. at 674-75. Rather, the need to deter and prevent a substantial harm provides the necessary immediacy for the imposition of a drug testing program. *Earls*, 536 U.S. at 836. As the *Earls* Court noted, it would make little sense to require the test designated group to begin using drugs before the state was allowed to institute a program designed to deter its use. *Id*. Moreover, unlike *Chandler*, in the instant case there exists the potential for substantial harm that the state is entitled to attempt to prevent. It is certainly true that employees who either have 1) law enforcement duties, 2) direct and unsupervised contact with prisoners, 80 percent of whom have a history of drug abuse, or 3) a responsibility to deliver health care or psychological services to persons in

state custody, would pose a significant potential threat to the health and safety of themselves and others if they use drugs or were under the influence of drugs while on duty.

Having concluded that the state has asserted sufficient special needs, based on substantial, and not merely hypothetical, public safety concerns, to justify the testing of employees without individualized suspicion, we next consider whether the State's interest in the drug testing outweighs the employees' reasonable expectations of privacy. It is well established that an individual who participates in a heavily regulated industry or activity has a diminished expectation of privacy. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 627 (noting that railroad employees have a diminished expectation of privacy because they participate in a pervasively regulated industry); *See Veronica*, 515 U.S. at 657 (analogizing student-athletes to employees in closely regulated industry, who "have reason to expect intrusions upon normal rights and privileges, including privacy"); *See also, Earls*, 536 U.S. at 832 (applying the same reasoning to students who participate in extracurricular activities); *Knox County*, 158 F.3d at 379 (finding that teachers' legitimate expectation of privacy is diminished by their participation in a heavily regulated industry). The employees who are subject to testing work either in law enforcement (parole and probation officers), the medical profession (nurses, occupational therapists, etc.), or inside a prison (teachers, chaplains, dieticians, etc.). It is certainly true that parole and probation officers, who are charged with supervision of felony offenders, participate in a heavily regulated field. Similarly, those employees who provide healthcare and other services to prisoners and patients of state run facilities are also subject to comprehensive regulations. Finally, employees who work within prisons obviously work in a highly regulated context. Therefore, since these employees work in highly regulated fields, we conclude that they have a diminished expectation of privacy.

Next, we consider the character of the intrusion. The degree of intrusion caused by collecting a urine sample "depends upon the manner in which production of the urine sample is monitored." *Earls*, 536 U.S. at 832 (quoting *Veronica*, 515 U.S. at 658). The procedure for collecting a urine sample under the drug testing policy at issue here requires that individual privacy be preserved unless there are grounds to suspect tampering. The policy provides that while the "specimen collector may be outside the bathroom or restroom in the near proximity, the employee closes (and locks, if he/she chooses) the door and has full privacy while urinating." This procedure is even less intrusive than the monitoring sustained in *Veronica* as "negligible." *Veronica*, 515 U.S. at 658 (holding the intrusion to be "negligible" even though male students were required to produce samples at a urinal along a wall while observed from behind).

The Plaintiff argues, however, that since the drug tests are conducted on a random and continuous basis, rather than on the occurrence of a triggering event such as a promotion, the invasion of privacy is "qualitatively more intrusive" because the employees are subjected to "unrelenting scrutiny" and repeated "unsettling shows of authority." The fact that the drug tests are conducted on a random and continuous basis does not change our calculus that the drug testing program is not highly intrusive. First, since only fifteen percent of the affected workforce is tested each year, an individual employee can expect to be tested only once every seven years on average. Moreover, to the extent the random and continuous drug tests are more intrusive, this is offset by the fact that such tests are also more efficacious than one time tests at achieving their intended result: to deter and prevent drug use to protect public safety and health. As the Court

noted in *Skinner*[6], "[b]y ensuring that employees ... will be tested [at a time] which no employee can predict with certainty, the [drug testing policy] significantly increase[s] the deterrent effect of the ... penalties associated with the prohibited conduct." 489 U.S. at 630.

Since we conclude that the State has offered sufficiently vital special needs, based on substantial public safety concerns, to overcome the traditional requirements of individualized suspicion, and that these special needs outweigh the employees diminished expectations of privacy, we AFFIRM the district court's holding that the program does not violate the Fourth Amendment to the United States Constitution.

---

[6]Although the policy in *Skinner* provides that drug tests will be conducted upon the occurrence of an accident, since no one can predict with certainty the occurrence of an accident (unlike the timing of a decision to apply for a promotion), drug tests under the policy are therefore conducted randomly.