In re Michael Francis COOK, Debtor.

No. 04–62670.

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

March 31, 2005.

Robert Harbert, for the Chapter 13 Trustee.

Donald Little, for the debtor.

## MEMORANDUM OF DECISION

RUSS KENDIG, Bankruptcy Judge.

This matter comes before the court upon the objection to confirmation filed by the Chapter 13 Trustee (hereafter "Trustee") to debtor Michael Francis Cook's (hereafter "Debtor") first amended plan.

## *JURISDICTION*

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## *FACTUAL BACKGROUND*

Debtor filed for bankruptcy relief under Chapter 13 of the Bankruptcy Code[1] on May 18, 2004 and filed his Chapter 13 plan contemporaneously with his petition. On Schedule A, Debtor disclosed ownership of an unencumbered parcel of real property valued at $85,000,[2] yet less than $35,000 in unsecured claims is scheduled.[3] The proofs of claim do not exceed this amount materially. Trustee objected to the confirmation of Debtor's first plan which provided for a 100% distribution to unsecured creditors. On September 20, 2004, Debtor filed a brief in support of confirmation, and Trustee filed a brief in support of her objection on October 8, 2004. On November 11, 2004, Debtor filed an amended plan which also provided for a 100% distribution to unsecured creditors.[4] On December 7, 2004, Trustee filed a Notice of Applicability of Brief in Support of Interest Rate to Amended Plan and Trustee's Objection to Same. Debtor did not respond to this notice, relying on his earlier brief.

## *ARGUMENTS*

Trustee argues that Debtor must pay interest on allowed unsecured claims, basing this argument on the language of 11 U.S.C. § 1325(a)(4) and Sixth Circuit case law. Trustee further argues that the recently decided *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), compels Debtor to pay interest at the prime rate plus an appropriate risk factor, one percent in this case.

Debtor asserts that unsecured creditors are not entitled to interest to be paid through a Chapter 13 plan. Even if creditors are entitled to interest, Debtor contends that they are only entitled to interest at the federal judgment rate.

## *ANALYSIS*

### I. Unsecured Creditors Are Entitled to Receive Interest

If the language in a statute has a clear meaning, the function of courts is to enforce the statute according to its terms. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). A court's inquiry begins with the statutory text and ends there as well, provided that the text is unambiguous. *BedRoc Ltd.*,

---

1. Unless otherwise stated, references to "the Code" or "the Bankruptcy Code" are to Title 11 of the United States Code. Unless otherwise stated, a reference to a "section" is a reference to a section within the Bankruptcy Code.

2. The recorded deed indicates that Debtor received this property from Richard and Frances Cook for the sum of "love and affection." This appears to be an example of misguided estate planning which explains the unusual situation.

3. Debtor's schedules list unsecured priority claims in the amount of $7,024 and unse-

cured nonpriority claims in the amount of $8,151. In addition, the unsecured portion of the claims of New Century Mortgage Corp. and the Canton Police and Fire Credit Union total approximately $19,000.

4. The amended plan differed from the original plan in that it crammed down a loan owed to the Canton Police and Fireman's Credit Union instead of paying this loan in full outside of the plan. Since unsecured creditors receive a 100% distribution in both versions of the plan, the only practical difference this makes is to vary the interest paid to the credit union.

*LLC v. United States*, 541 U.S. 176, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004). The language of 11 U.S.C. § 1325(a)(4) requires that unsecured creditors receive interest in plans in which a debtor's assets exceed his or her liabilities. This section provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> . . .
>
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1325. In *Hardy v. Cinco Fed. Credit Union (In re Hardy)*, 755 F.2d 75 (6th Cir.1985), the Sixth Circuit ruled that creditors are entitled to interest when a Chapter 13 plan proposes a 100% distribution. The court based its ruling on the language and legislative history of § 1325(a)(4), both of which indicate that the value of property to be distributed under a Chapter 13 plan must be reduced to its present value. *Id.* at 77. The phrase "the value, as of the effective date of the plan" indicates that the Chapter 7 value is measured at a single moment— when the plan becomes effective. A stream of payments extending over a period of thirty-six months or longer does not equal this value because the time value of money is not realized. Therefore, the payments must be discounted to present value so that the unsecured creditor realizes the amount it would have received under Chapter 7 as of the date the plan becomes effective. *See Hardy*, 755 F.2d at 77.

■ Debtor would gladly pay his creditors Tuesday for a hamburger today.[5] However, the Code recognizes that a hamburger eaten today is worth more than payment for it on Tuesday due to the time value of money and, in the view of some courts, the risk of nonpayment. Thus the Code requires Debtor to pay interest to his unsecured creditors as directed in section 1325(a)(4).[6]

## II. Proper Rate of Interest

### A. Section 1325(a)(4) Controls the Amount of Interest to Be Paid to Unsecured Creditors Through Debtor's Plan of Reorganization

Debtor argues that the post-judgment interest rate proscribed by 28 U.S.C. § 1961 is the rate of interest to which creditors are entitled under 11 U.S.C. § 1325(a)(4). In support of this argument, Debtor relies heavily on *Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231 (9th Cir.2002), *cert. denied*, 537 U.S. 1072, 123 S.Ct. 663, 154 L.Ed.2d 566 (2002). The issue in this Chapter 11 case was whether post-petition interest awarded pursuant to 11 U.S.C. § 726(a)(5) should be calculated using the federal judgment

---

5. This statement is derived from the saying "I will gladly pay you Tuesday for a hamburger today" which was oft spoken by J. Wellington Wimpy, a character in the Popeye comic.

6. Although the *Hardy* case held that interest must be paid to unsecured creditors in the case of a plan that proposes a 100% distribution due to Chapter 7 value, the language of 11 U.S.C. § 1325(a)(4) indicates that a stream of payments to unsecured creditors must always be discounted to present value when conducting a "best interests" analysis. The text of the statute draws no distinction between a full distribution to unsecured creditors and a partial distribution. *See In re Martin*, 17 B.R. 924 (N.D.Ill.1982). It should be noted that a present value calculation under § 1325(a)(4) is only necessary when the stream of payments to unsecured creditors, *discounted to its present value*, is less than Chapter 7 value.

rate, the underlying contract, or state law. *Id.* at 1233. The court used the federal judgment rate.

*Cardelucci* is representative of cases holding that the federal judgment rate is the proper rate of interest under 11 U.S.C. § 726(a)(5). *See, e.g., In re Country Manor of Kenton,* 254 B.R. 179 (Bankr. N.D.Ohio 2000); *In re Dow Corning Corp.,* 237 B.R. 380 (Bankr.E.D.Mich.1999); *In re Chiapetta,* 159 B.R. 152 (Bankr.E.D.Penn. 1993); *In re Melenyzer,* 143 B.R. 829 (Bankr.W.D.Tex.1992). A well respected bankruptcy treatise concurs with the result in these cases. 6 Collier on Bankruptcy ¶ 726.02[5] (15th ed.2004).

However, Debtor's reliance on *Cardelucci* is misplaced. The relevant statutory provision for determining the amount of interest to be paid through Debtor's plan is § 1325(a)(4), not § 726(a)(5). *See In re Martin,* 17 B.R. 924 (N.D.Ill.1982). Section 726(a)(5) deals with pendency interest—interest arising after the commencement of the case but before the effective date of the plan. *Cardelucci* dealt strictly with post-petition, pre-confirmation interest in Chapter 11. Section 1325(a)(4) requires a distribution to unsecured creditors of a value, as measured on the effective date of the plan, greater than or equal to what would be received under a Chapter 7 liquidation. The question in this case is the proper rate of interest required to yield this full liquidation value, and the pertinent Code section for determining the amount of interest required for confirmation is 1325(a)(4).

### B. *Till v. SCS Credit Corporation*

Trustee argues that the Supreme Court decision *Till v. SCS Credit Corp.,* 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) dictates that unsecured creditors be paid a "formula" or "prime-plus" rate of interest. In *Till,* the petitioners were Chapter 13

debtors and respondent was a creditor with a claim secured by the debtors' truck. The creditor's claim was $4,894.89 and the value of the collateral was $4,000.00. Accordingly, the debtors sought to cram down the secured claim to the value of the collateral. The issue on appeal concerned the proper rate of interest to be paid on the secured value. Debtors sought to use a "formula rate" which was calculated by taking the national prime rate and augmenting it with a risk adjustment. *Id.* at 1957.

A plurality of four Justices decided that the "formula rate" was an acceptable rate of interest. *Id.* at 1961. Three considerations guided the plurality's decision. *Id.* at 1958. First, there are several bankruptcy provisions that require a court to discount a stream of deferred payments back to their present value. Four Justices concluded that Congress would want bankruptcy courts to use the same approach in all these sections and to use an approach that is familiar to the financial community and which reduces the need for expensive evidentiary proceedings. *Id.* at 1958–59. Second, a court has the ability to modify the rights of a creditor whose interest is not secured by real property. Thus, a loan can be modified for intervening changes in circumstances, such as the "somewhat reduced" risk of default present in the court supervised post-bankruptcy estate. *Id.* at 1959. Finally, from a creditor's point of view, the cram down provision necessitates an objective inquiry rather than a subjective one. A court need not consider a particular creditor's pre-bankruptcy dealings with the debtor and should instead aim to treat similarly situated creditors similarly. *Id.* at 1959–60.

With these considerations in mind, the plurality rejected the coerced loan, presumptive contract rate and cost of funds approaches in favor of the formula rate

approach. *Id.* at 1960. In deciding the magnitude of the rate increase that compensates a creditor for increased risk, a bankruptcy court should consider the nature of the underlying security, the circumstances of the estate, and the feasibility of the proposed plan. *Id.* at 1961. The plurality did not give an opinion as to the proper scale for the risk adjustment.

In the concurring opinion, Justice Thomas supported using a risk free rate, without adjustment, as the appropriate rate of interest. *Id.* at 1965. Justice Thomas reasoned that the text of 11 U.S.C. § 1325(a)(5)(B)(ii) does not support a risk adjustment since the statute only requires a valuation of the *property* to be distributed, not the value of debtor's *promise* to pay. *Id.* Justice Thomas stated that it does not make sense to speak of the risk of default when valuing property by itself since the risk of nonpayment only enters the equation when the promise to pay is considered. *Id.* at 1966. Justice Thomas concurred because he concluded that the debtor, by offering more than the prime rate, was paying more than was required.

### C. *The Till Decision Is Not Binding Authority*

A problem arises when attempting to distill a rule of law from the *Till* decision due to the absence of a majority opinion. Courts following the *Till* decision do so without fully exploring the fact that five Justices did not agree on a legal rationale. *See, e.g., In re Bivens,* 317 B.R. 755 (Bankr.N.D.Ill.2004) (overruling creditor's objection to cram down rate of interest based on the plurality reasoning in *Till*); *In re Scrogum,* 2004 Bankr.LEXIS 1376 (Bankr.C.D.Ill.2004) (stating that the Supreme Court has determined the formula approach is the appropriate method for determining interest on cram down loans); *In re Harken,* 2004 WL 3019467, 2004 Bankr.LEXIS 2062 (Bankr.N.D.Iowa 2004) (same); *Baxter v. Berksteiner (In re Berksteiner),* 2004 WL 2201300, 2004 Bankr.LEXIS 1576 (Bankr.S.D.Ga.2004). The lack of a legal rationale shared by five Justices leads to the inescapable conclusion that *Till* does not produce binding precedent.

### 1. *The "narrowest grounds" test*

The precedential value of plurality decisions in which no single rationale enjoys the assent of five Justices has been a difficult issue for lower courts. Legal scholars have espoused several methods of determining whether a fractured decision should result in precedent that is binding. *See* Ken Kimura, *Note: A Legitimacy Model for the Interpretation of Plurality Decisions,* 77 Cornell L.Rev. 1593 (1992). The only approach approved by the Supreme Court is the "narrowest grounds" approach. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' " *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

The Supreme Court has acknowledged that this test is difficult to apply at times and produces varying results in lower courts. *Grutter v. Bollinger,* 539 U.S. 306, 325, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); *Nichols v. United States,* 511 U.S. 738, 745, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (noting the various interpretations of *Baldasar v. Illinois,* 446 U.S. 222, 100 S.Ct. 1585, 64 L.Ed.2d 169 (1980) applied by the circuits). The Court in both *Grutter* and *Nichols* decided not to engage in the narrowest grounds analysis since it had "baffled and divided the lower courts

that have considered it." *Grutter*, 539 U.S. at 325, 123 S.Ct. 2325. However, the Supreme Court does not explicitly abandon the *Marks* inquiry in these cases and subsequent decisions by lower courts continue to employ the *Marks* analysis. *See, e.g., International Union v. Winters*, 385 F.3d 1003 (6th Cir.2004); *United States v. Stewart*, 388 F.3d 1079 (7th Cir.2004).

■ Many courts seek a common denominator in the reasoning of five Justices when applying the narrowest grounds test. The approach is viable when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion "must embody a position implicitly approved by at least five Justices who support the judgment." *Rappa v. New Castle County*, 18 F.3d 1043, 1057 (3d Cir.1994) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C.Cir.1991)). If no common denominator in the Court's legal reasoning can be discerned, the plurality does not carry the weight of the Supreme Court. *Id.*

### 2. *There is no common denominator among the decisions in Till*

The common denominator approach does not yield a majority decision in the *Till* case. While the plurality and the concurrence [7] might agree that the prime rate is an appropriate starting point in determining the proper rate of interest,[8] the reasoning used to reach this conclusion shares no common ground.

Justice Thomas reasons that the statutory text requires a valuation of the *property* to be distributed, not the *promise* to pay. *Till*, 124 S.Ct. at 1965. Because the risk of default is not relevant when valuing the property by itself, the riskless rate will satisfy the statute. *Id.* at 1966.

The plurality settled on the formula approach by rejecting the cost of funds approach, presumptive contract rate approach, and coerced loan approach. The court found that "[e]ach of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value." *Id.* at 1960. The formula approach was selected because it possessed none of these defects.

Thus, unlike the coerced loan, presumptive contract rate, and cost of funds

7. When considering the precedential value of plurality opinions, it is important to note whether the concurrence joins the majority opinion or concurs in the judgment only. A Justice that writes separately but joins in the majority opinion agrees with both the result and legal reasoning. A Justice that joins in the judgment only agrees with the result but dissents from the majority reasoning. Igor Kirman, *Note: Standing Apart to be Apart: The Precedential Value of Supreme Court Concurring Opinions*, 95 Colum. L.Rev.2083 (1995). Justice Thomas concurred only in the judgment of the *Till* decision.

8. Although he does not state directly that the prime rate is appropriate, Justice Thomas asserts that in most cases the risk-free rate of interest will suffice. In a footnote, Thomas quotes a source which states that the prime rate most closely approximates the riskless rate. *Till*, 124 S.Ct. at 1966. There is great doubt as to the current meaning of prime rate and stirring in equal portions of the words "riskless rate" accelerates the confusion. Prime has been de-linked from the usual cost of funds measures. See the statistics compiled at http://www.nfsn.com/library (last visited on March 30, 2005). The prime rate did not drop nearly as much as the one year constant maturity treasury rate or any other measure in recent years. Further, lending clearly takes place beneath the prime rate. Prime appears to be an artificial construct used to create the illusion of legitimacy for other lending rates by basing those rates on some adjustment of the so-called prime rate. There is an array of literature on the subject of the contemporary meaning of prime rate, but that is a subject for another day.

approaches, the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings. Moreover, the resulting 'prime-plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor. For these reasons, the prime-plus or formula rate best comports with the purposes of the Bankruptcy Code. *Id.* at 1961.

The plurality's reasoning shares no common ground with Justice Thomas' inquiry into the statutory text or his conclusion that the text mandates interest at the "riskless" rate. In fact, the plurality explicitly rejected Justice Thomas' conclusion stating: "we think it too late in the day to endorse [the risk free approach] now." The plurality further states that a better reading of § 1325(a)(5)(B)(ii) incorporates all components of "present value" which would include any risk of nonpayment. *Id.* at 1964. Thus, the unavoidable conclusion is that the *Marks* test does not yield a legal rationale upon which five Justices agree.

### 3. *The Till decision is not binding precedent*

■ Due to the lack of a consensus on a legal rationale, the *Till* decision results in no *binding* precedent. "[A]n affirmance by an equally divided court is as between the parties a conclusive determination and adjudication of the matter adjudged, but the principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases either in [the Supreme Court] or in inferior courts." *Hertz v.*

*Woodman,* 218 U.S. 205, 213–14, 30 S.Ct. 621, 54 L.Ed. 1001 (1910). *See also Texas v. Brown,* 460 U.S. 730, 737, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (stating that reasoning not adopted by a majority of the court is not binding precedent); *United States v. Alcan Aluminum Corp.,* 315 F.3d 179, 188–89 (2d Cir.2003) (Supreme Court case where no rationale commanded majority support did not overrule prevailing authority); *Commonwealth Edison Co. v. United States,* 46 Fed.Cl. 29 (Fed.Cl.2000) (finding that a Supreme Court opinion did not constitute binding precedent as the plurality and concurrence shared only in the result, not the legal reasoning).

■ The authority of a Supreme Court decision that does not contain a majority rule is confined to its holding. *Alcan Aluminum Corp.,* 315 F.3d at 189; *Steele v. Indus. Dev. Bd.,* 301 F.3d 401, 408 (6th Cir.2002); *Schindler v. Clerk of Circuit Court,* 715 F.2d 341, 345 (7th Cir.1983). In *Till,* the result reached by the Supreme Court was that the proposed interest rate of 9.5% satisfied the requirements of 11 U.S.C. § 1325(a)(5) with respect to the particular creditor in the particular case.

Thus, courts which have held that *Till* stands for the proposition that the formula rate is a confirmable rate of interest under § 1325(a)(5)(B)(ii) are not necessarily mistaken on certain facts. In order to reach this result from the *Till* decision, a court must view the *Marks* test as one which seeks to predict how the court will rule on a future issue. Although courts engage in this predictive analysis, this is not the holding of *Marks.* Moreover, it is dangerous to begin assembling a theory of precedent that attempts to divine how the Supreme Court would decide every single case in the federal courts. This model would be particularly difficult in time periods in which court personnel change more rapidly. The current Supreme Court has

been unusually stable in membership, but this recent experience does not serve as grounds for discarding centuries of wisdom. In the absence of five Justices agreeing on a rationale, there continues to be no national precedent. The bankruptcy constituencies' overwhelming thirst for "the rule" must wait to be slaked.

Assuming no change in the position of the Justices, the question "Does the formula rate satisfy the requirements of 11 U.S.C. § 1325(a)(5)(B)(ii)?" will currently be answered in the affirmative.[9] But, it would not always be answered in the affirmative. Americans assume that it would be answered affirmatively because we have enjoyed a period of approximately twenty-six years of falling interest rates. Sadly, the court recalls a time period when this was not so and interest rates rose persistently. If a pattern of rising rates recurs, it is foreseeable that the contract rate of some earlier time would be *less* than or equal to the current riskless rate. How would one predict the outcome of nine Justices in such a fact pattern? A rule of law must be based on the course of human events, not just the most recent course of human events. An interpretation of *Till* that identifies a binding rule is an interpretation that makes many assumptions about facts or relationships staying constant. Put differently, the opinion of five Justices makes the law of the land, but the opinion of four Justices makes interesting reading.

The *Till* court had no majority concerning the meaning of the phrase "the value, as of the effective date of the plan, of property to be distributed under the plan . . . ." Thus, this court must look elsewhere for guidance on the proper rate of interest under 11 U.S.C. § 1125(a)(4).

### D. *The Rate of Interest Under 11 U.S.C. § 1325(a)(4)*

■ Several considerations guide the court in making a determination as to the proper rate of interest. First, the court must consider that interest in this case is sought under 11 U.S.C. § 1325(a)(4), not § 1325(a)(5)(B)(ii), and that these sections contain similar language. Second, even if this court was deciding the correct rate of interest under § 1325(a)(2)(B)(ii), the *Till* decision is not binding. Finally, since there is no binding Supreme Court precedent it is proper to look to Sixth Circuit case law for a resolution.

Both 11 U.S.C. § 1325(a)(4) and 11 U.S.C. § 1325(a)(5)(B)(ii) contain the language "value, as of the effective date of the plan." Although a plurality of the Supreme Court suggests in footnote ten of the *Till* decision that this language should be given a consistent meaning throughout the Bankruptcy Code, this is dicta. However, there are other considerations that weigh in favor of giving a consistent interpretation to this phrase.

■ There is a general preference for courts to interpret statutory language con-

---

**9.** A case before the Supreme Court in which the formula rate was applied would have the support of five Justices: four would affirm based on their support of the formula rate and Justice Thomas would affirm because the debtor is "voluntarily" paying more than the statute requires.

This is not to say that there exists a "narrowest grounds" under *Marks* as is illustrated by the following hypothetical situation. Suppose a court confirmed a plan which

provided a cram down rate of interest at the riskless rate, which is less than the contract rate. The current Supreme Court would reverse in a 4—4—1 decision. Eight Justices would concur in the judgment with four applying the formula rate and four applying the contract rate. Justice Thomas would vote to affirm. This illustrates that there is no underlying, shared rationale among the Justices.

sistently in different sections of the Code. *Firstar Bank, N.A. v. Faul,* 253 F.3d 982, 990 (7th Cir.2001) ("[W]here a word is given a consistent meaning throughout the United States Code, then the courts assume that it has that same meaning in any particular instance of that word."); *Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818, 827 (1st Cir.1992) ("It is ... a general rule that when Congress borrows language from one statute and incorporates it into a second statute, the language of the two acts should be interpreted the same way."); *In re Bloebaum,* 311 B.R. 473, 477 (Bankr.W.D.Tex.2004) (adopting an interpretation of the phrase "except to the extent" which preserved the consistency of that phrase's meaning throughout the Code). This has logical appeal. It makes sense that Congress would intend identical language to have identical meaning when it is used twice in the same section of the Code.

The *Till* decision provides no majority rule as to the meaning of the language "the value, as of the effective date of the plan." It is necessary to look to Sixth Circuit case law for the proper rate of interest as no other Supreme Court case addresses the issue, and the *Till* plurality does not overrule the binding precedent of the circuit. *See Combined Properties/Greenbriar Ltd. P'ship v. Morrow,* 58 F.Supp.2d 675, 681 (E.D.Va.1999) (finding that since a fragmented Supreme Court decision was not entitled to precedential weight, Fourth Circuit case law on point remained controlling). Although there is no Sixth Circuit case which squarely addresses the applicable rate of interest under 11 U.S.C. § 1325(a)(4), the approach taken by the Sixth Circuit in deciding the rate of interest under § 1325(a)(5)(B)(ii), which is the "coerced loan" approach, is particularly appropriate here due to the identical language in § 1325(a)(4) and the particularities of this case. The coerced loan approach was endorsed by the Sixth Circuit in *Memphis Bank and Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982) and subsequently reaffirmed by the court in *Household Auto. Fin. Corp. v. Burden (In re Kidd),* 315 F.3d 671 (6th Cir.2003). The Sixth Circuit concluded in these cases that current conforming market rates of interest would be the best indicators of the present value of a secured claim. *Id.* at 677.

Due to the amount of equity in Debtor's estate, the unsecured creditors are in a position similar to that of an oversecured creditor who made a short term loan to Debtor. An example of this type of loan would be a home equity lender who has not expended credit up to the full value of the collateral. The going interest rates for home equity loans in this region vary from prime minus one percent to prime minus zero percent. *See* http://www.charterone.com (last visited March 14, 2005); http://www.wellsfargo.com/equity (last visited on March 14, 2005); http://www.thelendingtree.com/stm3/default.htm (last visited on March 14, 2005). Due to the similarities between the unsecured creditors in this case and a home equity lender, the average available rate on a home equity loan, prime minus one-half of one percent, is more than sufficient to satisfy the requirements of 11 U.S.C. § 1325(a)(4). This rate will provide the unsecured creditors with the present value of their property to be distributed under Debtor's Chapter 13 plan as required by the Code.

In addition to the relevant case law, there are compelling practical reasons that support this interest rate. In this case, the unsecured creditors are actually in a better position than most secured lenders

because of the disproportionate amount of equity in the estate.[10] The unsecured claims only amount to one third of the available equity were this estate to be liquidated. If the Debtor's plan fails, the unsecured creditors will still have their claims. They will also have the ability to file suit and obtain judgment liens against the unencumbered equity of Debtor's real estate. Thus, although there could be other approaches that this court could use to arrive at the proper rate of interest,[11] in this situation, where the value of the unsecured claims is greatly exceeded by the liquidation value of the estate, the going rate for short-term, over-secured loans will suffice to fulfill the requirements of 11 U.S.C. § 1325(a)(4). While most home equity loans provide the lender with the protection of a variable rate, this plan should not extend beyond three years. Additionally, protection greater than the typical home equity loan arises from the unusual amount of equity. These issues provide a counterbalance.

In an appropriate case, the court could adapt a rate in the event the facts of the case are not similar to any product available in the marketplace, using all of the relevant facts of the case. This provides grounds for dispute, but also provides incentives for negotiation and settlement. It is not always appropriate to burn the facts on the altar of judicial expedience. While the concept of uniformity is appealing, the ideal of justice is compelling.

This decision attempts to most clearly mirror the coerced loan approach in a different context. The specific facts are material, unlike the recurring automobile cram down which has clear, conforming market analogues that can be inserted. Thus, it is as fair as possible to the parties while respectful of precedential analysis. This decision is impelled by loyalty to mathematics and obedience to the rule of law. Four is not equal to five and a court of appeals decision binds bankruptcy courts in the circuit in the absence of contrary Supreme Court precedent.

10. In some ways, the Bankruptcy Code can put secured creditors at a greater disadvantage than unsecured creditors in Chapter 13. A secured creditor is prevented from defaulting the debtor and collecting its depreciating collateral, thereby being exposed to a risk for which it did not bargain. An unsecured creditor, on the other hand, has no such disadvantage. The unsecured creditor is receiving payments without having to file a lawsuit and pursue execution.

11. One approach would, as Debtor requests, start at the federal judgment rate. However, this interest rate would be augmented by the requirement that a debtor propose the plan in good faith. In this particular context good faith would require that the debtor place all disposable income into the plan for thirty-six months and the rate of interest would be what would be yielded by the funding provided. However, since this could result in unconscionably high rates of interest, depending on the amount of disposable income available, a ceil-

ing on the interest rate would be set at the contract rate.

Another potential method would be a derivative of the formula rate articulated in *Till*. Under this approach, instead of starting at prime and adjusting upward, the adjustment could occur in either direction. This would be especially appropriate in cases where there is a 100% plan with abundant equity to spare. In these cases the unsecured creditors are not harmed by plan failure—they actually have more options available at that point to pursue receiving payment. In these situations a downward adjustment to the prime rate is warranted. Although both of these approaches are viable, the ease of the coerced loan approach and its prior approval by the Sixth Circuit make it the precedential choice to determine the appropriate rate in this case. Nothing prevents the court of appeals from reconsidering and confirming or changing its rule. This court does not have that power.

### CONCLUSION

Debtor must pay interest to his unsecured creditors as required by 11 U.S.C. § 1325(a)(4). As Debtor's plan currently does not provide for the payment of any interest to unsecured creditors, Trustee's objection to confirmation is SUSTAINED.

An Order consistent with this Memorandum of Decision shall enter forthwith.